**FILED UNDER SEAL**                                                Loveland/Ducao

## AFFIDAVIT

I, Patrick T. Winn being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for search warrants authorizing the search of the following items based on probable cause to believe that they contain evidence, fruits, and instrumentalities related to violations of 18 U.S.C. §§ 1952(a)(3) (Use of Interstate Facilities to Promote Business Enterprise involving Prostitution Offenses; 2422(a) (Persuasion, Induction, Enticement, and Coercion to Travel in Interstate Commerce to Engage in Prostitution and Criminal Sexual Activity); 2251(a) (Production of Child Pornography); and 2252(A)(5)(B) (Possession of Child Pornography).

    **a. Website Domain: www.wehavefuntimes.com** (*See* Paragraphs 20-41 for specific discussion; *see also* Attachments A-1 and B-1).[1]

    **b. The Residence Located at: 5 Hickory Lane, Elkton, Maryland 21921** (*See* Paragraphs 74-91 for specific discussion; *see also* Attachments A-2 and B-2).

    **c. The Cell Phone Assigned Telephone Number: 443-466-6826** (*See* Paragraphs 92-97, 105-107, and throughout for specific discussion; *see also* Attachments A-3 and B-3).

    **d. A 2008 Mitsubishi Lancer, Maryland License Plate: 3EDV57** (*See* Paragraphs 64-69 for specific discussion; *see also* Attachments A-4 and B-4).

    **e. A 2017 Jeep Grand Cherokee, Maryland License Plate: 8CP0647** (*See* Paragraphs 70-73 for specific discussion; *see also* Attachments A-5 and B-5).

---

[1] The facts described this affidavit support the probable cause to search for evidence, fruits, and instrumentalities for each of the above-listed items. Specific paragraph references in this section are provided only for ease of reference.

**f. The Person of XAVIER LEE, Born January 12, 1979**   (*See* Attachments A-6 and B-6).

**g. Days Inn Room Premises located at 311 Belle Hill Rd, Elkton, MD 21921, including Room #209 and the surrounding external areas of that rooms**. (*See* Paragraphs 42- 63 for specific discussion; *see also* Attachments A-7 and B-7).

**h. Days Inn Office located at 311 Belle Hill Rd, Elkton, MD 21921** (*See* Paragraphs 42- 63 and 98-104 for specific discussion; *see also* Attachments A-8 and B-8).

2.   This affidavit is also made in support of a criminal complaint and arrest warrant for Xavier Lee (LEE) born in 1979, 5 Hickory Ln, Elkton, MD 21921, for violation of 18 U.S.C. § 1952(a)(3) (Use of Interstate Facilities to Promote a Business Enterprise involving Prostitution Offenses).

3.   Finally, this affidavit is made in support of the forfeiture and seizure of the Endurance International Group website domain www.wehavefuntimes.com, pursuant to 18 U.S.C. §§ 2428; 981(a)(1)(C); & 2461.   *See* 18 U.S.C. §§ 1952(a)(3); 2422(a).

## IDENTIFICATION OF THE ITEMS TO BE SEARCHED

4. The website domain hosted by Endurance International Group, www.wehavefuntimes.com, the records of which are stored at premises, owned, maintained and controlled or operated by Endurance International Group, 1500 North Priest Drive, Suite #200, Tempe, AZ, 85281 and is described in Attachment A-1 (hereinafter the **TARGET WEBSITE**).

5. The premises located at 5 Hickory Lane, Elkton, MD 21921 (hereinafter the **TARGET RESIDENCE**).

6. The cell phone assigned telephone number 443-466-6826 (hereinafter the **TARGET CELL PHONE**).

7. The vehicle, a white 2008 Mitsubishi Lancer bearing Maryland license plate 3EDV57 (hereinafter the **TARGET VEHICLE #1**).

8. The vehicle, a white 2017 Jeep Grand Cherokee bearing Maryland license plate 8CP0647 (hereinafter the **TARGET VEHICLE #2**).

9. The person of Xavier Demarr Lee, born January 12, 1979 (**LEE**).

10.    The premises located at 311 Belle Hill Rd.: Room #209 and the surrounding external areas of that rooms, Elkton, MD 21921 (hereinafter the **Days Inn Room Premises**)

11.    The premises known as the Days Inn Office located at 311 Belle Hill Rd, Elkton, MD 21921 (hereinafter the **Days Inn Office**)

12.    The applied for warrants would authorize examination of the contents and records associated with the above listed subject locations, vehicles, devices, person, and website for the purpose of identifying evidence particularly described in Attachments B-1 through B-8 to this affidavit. I make this affidavit in support of an application for warrants to search these locations, vehicles, devices, person, and website domain.  This affidavit is also in support of a criminal complaint against Xavier Lee as well as a seizure warrant for the website domain www.wehavefuntimes.com.

13.    Based on the information outlined below, I believe that Xavier Lee, aka "X" and others conspired to cause at least twenty-one females to engage in a prostitution enterprise. Based upon the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1952(a)(3); 2422(a); 2251(a); and 2252(A)(5)(B) have been committed and were

3

facilitated by Lee and others and that evidence of those crimes will be found in the items and

locations to be searched.

## **AGENT BACKGROUND**

14.     I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and

have been so employed since September 2003. I am currently assigned to the FBI's Maryland

Child Exploitation Task Force where I predominately investigate child sex trafficking and

violent crimes against children. I have previously been assigned as a Supervisory Special Agent

at FBI Headquarters' Asset Forfeiture/Money Laundering Unit as well as a Special Agent in the

San Diego Division where I worked complex white collar crime matters and online sexual

exploitation of children matters for six years. I have received training and gained experience in

interviewing and interrogation techniques, arrest procedures, search warrant applications, the

execution of searches and seizures, computer crimes as well as the investigation of various child

exploitation crimes. I have been involved in the seizure of electronic devices and electronic

communication accounts and conducted evidentiary reviews pursuant to authority to search these

items.  During the more than fifteen years in Federal law enforcement, I have been involved in

investigations of sexual exploitation of children to include child pornography, enticement of

minors, child sex trafficking and adult sex trafficking.

15.     The information contained in this affidavit is based upon my personal knowledge

as well as information and documents made available to me by other law enforcement officers

and witnesses.  Since this Affidavit is being submitted for the limited purpose of securing search

warrants and a criminal complaint, I have included only those facts that I believe are sufficient to

establish probable cause to believe that Lee and others have violated 18 U.S.C. §§ 2422(a),

1952(a)(3), 1956, 2251(a) and 2252(A)(5)(B) and that evidence, fruits and instrumentalities of those violations will be found within these electronic communication accounts.

## BACKGROUND ON HUMAN TRAFFICKING AND PROSTITUTION OFFENSES

16.      I have received formal and on-the-job training in the investigation of sex trafficking and prostitution. I have participated in numerous investigations, which led to the arrest and conviction of sex traffickers, and I have become familiar with the habits, mannerisms, language, and techniques used in human trafficking offenses, prostitution offenses, and attempts to conceal the evidence of such occurrences from detection by both the public at large and law enforcement agencies. I have spoken with and read documentation by officers who possess knowledge and expertise in the investigation of prostitution and sex trafficking crimes. I have spoken to hundreds of victims of sex trafficking about their experiences in the life of prostitution. I have also participated in many aspects of sex trafficking investigations, including conducting physical surveillance, interviews, reviewing electronic evidence, using confidential human sources, writing and executing search and seizure warrants, and making arrests. I have gained knowledge of the inner working of prostitution and sex trafficking organizations and based on my training and experience know the following:

   a.  Prostitution is inherently a cash business, as cash provides paying customers with some form of anonymity. Prostitution organizations often move and launder the cash by placing it into it into bank accounts, using casinos to launder sources of cash, wire transfers, store value credit/debit cards, online e-currency, and other types of assets.

   b.  Websites such as, www.backpage.com, www.adultsearch.com, www.megapersonals.com and others are often used by prostitution organizations to

advertise commercial sex services. Organizations will often advertise their services as "massages" or "escorts" in an attempt to avoid detection by law enforcement. The term "escort" is widely used as a euphemism for prostitution. I know that a legitimate "escort" is hired for an extended period of time such as several hours and even days. An "escort" is expected to be attractive and presentable in public. They are often used to stand-in as a date for specific functions or entertainment for an evening. "Escorts" are paid for their time and their company and sexual favors are not included as part of their package. Legitimate "escorts" or "massage" parlors do not list coded language for the services they provide such as: "GFE" (term meaning Girlfriend Experience), "Greek" (term meaning anal sex) or "BBBJ" (term meaning Bare Back Blow Job). I also know that legitimate "escorts" or "massage" parlors do not typically advertise services by posting sexually provocative photographs or by providing the age, height, and/or weight of the person providing the massage. Legitimate escort and massage businesses typically do not operate from a motel room paid on a day-by-day basis, nor from an apartment. I also know legitimate escorts and masseuses do not perform sexual acts on their customers and therefore do not provide condoms or wear lingerie when interacting with the customer.

## **PROBABLE CAUSE**

17.      In June 2018, one of Lee's former close personal friends (Witness 1), who had discussions with Lee over the past two years, told Officers from the Elkton Police Department that Lee often rents the same room at a Days Inn, located at 311 Belle Hill Rd, Elkton, MD, and that Lee has prostituted females from that location. Witness 1 is not being compensated, nor is Witness 1 cooperating in anticipation of any benefits related to pending criminal charges.

Witness 1 does have a criminal history that includes drug offenses, robbery, and theft of credit cards. As will be discussed in detail below, much of the information provided by Witness 1 has been corroborated by law enforcement surveillance and investigation.

18.     On October 11, 2018, Witness 1 was interviewed and explained how Lee's prostitution business works. Witness 1 explained that Lee checks into the Days Inn just before 11:00 am on most weekdays. Lee enters the lobby and pays for the hotel room with approximately $70 in cash. Lee then drives his car, with the females working that day inside it, to the back of the hotel and walks up to the second floor to a room in the corner facing the front of the hotel. This room has been identified as room #209. Upon the arrival of each prostitution customer, Lee meets the male in the room and collects the money from him. Lee then leaves the male customer alone in the room with the specific female the customer requested. Upon completion of the date, Lee returns to the room awaiting the next customer. Witness 1 believes that the hotel staff are complicit in the prostitution activities because Lee has rented the same room most weekdays for the last eight to ten years.

19.     In 2014 an Elkton Police Officer learned of Lee's activities and conducted several days of surveillance of Lee and the Days Inn. The surveillance evidence collected by this Officer was almost identical to the pattern Witness 1 described above. However, Lee's suspected criminal activity was not immediately investigated further due to the availability of resources.

## WWW.WEHAVEFUNTIMES.COM WEBSITE

20.     Witness 1 told me that Lee operates a website called www.wehavefuntimes.com. Lee, and the females who work for him, have told Witness 1 the females have sex with the customers in exchange for money whom they meet through www.wehavefuntimes.com

7

(TARGET WEBSITE). Through a review of the TARGET WEBSITE in June 2018, the front page states that "This site contains material intended for adults only. If you are not at least 18 please leave now. Please note that you are paying for the time with the ladies and we do not offer illegal services."

21. According to instructions posted on the website, www.wehavefuntimes.com, a $200 fee is collected from each customer for one hour of time with a female. Note: as of February 2019, Lee posted to the TARGET WEBSITE that his fees were increased to $300 per hour as he has not changed his rates in a "decade". According to the website, services are offered to include "Roulette Girl", "The Two Girl Split", "The Double", "The Half Double", and "The Stranger". The website describes what each service is and the associated fees. For example, the website says the "Roulette girl is a new service in which we randomly match you with one of our girls for a lower than normal rate. Roulette girls are girls who are willing to be apart [sic] of our erotic massage team but want to remain anonymous. This is a great way to bring even more girls to the market. Ideally they will consist of brand new girls that are new to the business, but may also include current and past WHFT girls." WHFT is an acronym for the website name "We Have Fun Times".

22. Starting in June 2018, SA Winn has observed messages posted on this website with names of females that appear to be available to the site's customers on certain days between the hours of 11:00 am and 6:00 pm. For example, Lee's post on November 8, 2018 stated the following:

"Hi Folks,

Today we will have Kiarra and Candy working together from 11am until 6pm. Candy has a profile already and we will be working on Kiarra's soon. Kiarra is 29 with average

body type about 5'4", and has a medium length brown hair (and great natural boobs).

Give us a call now to reserve your appointment time.

443-466-6826"

23.     Posts are made almost every weekday and have not been observed on weekends. The website's home page says that the site is "purely for entertainment purposes" and that, with respect to payment for meeting with any of the females, "you are paying for her time only." The website also notes that www.wehavefuntimes.com verifies customer identities and maintains a high standard of conduct for both customers and females.

24.     According to the TARGET WEBSITE, in order to arrange a date, customers are asked to call 443-466-6826, the TARGET CELL PHONE. If the potential customer would like to become a member of the website, they are required to send a picture of themselves holding their "ID" as well as a picture of just their "ID". The TARGET WEBSITE does not want the user's personal information, just their first name. This is done because "it's the best way for us to filter out those that are less than serious about our services. However for those of you who make it in you will find a whole world of entertainment like nothing else." The TARGET WEBSITE also asks for the users name, desired username and email address.

25.     When the TARGET WEBSITE is accessed, users (both member and guests) can see a section on the left side that is labeled "Who's Online". In this box are the statistics of how many guests and how many members are on-line at that time. The website then lists all of the members who are online by their chosen screen name.

26.     On September 12, 2018, your Affiant and FBI Task Force Officer, Detective Daniel Dickey from the Anne Arundel County Police were conducting surveillance on the Days Inn in Elkton. Detective Dickey, acting in an undercover capacity, called telephone number 443-

466-6826 and requested a username and password to the TARGET WEBSITE. Detective Dickey spoke to a female who asked him to email his picture and a picture of his identification to admin@wehavefuntimes.com. After unsuccessfully emailing the information, Detective Dickey was asked to text the images and his desired username to 443-466-6826, the TARGET CELL PHONE, which he did. Detective Dickey received a response text from the TARGET CELL PHONE indicating his desired username and a password to access the TARGET WEBSITE.

27.     Using this username and password for the TARGET WEBSITE, a review of the "Community Forums" section was conducted by your Affiant. Messages were observed by apparent customers talking about which females will perform "BBBJ" (bare back blow jobs) which your Affiant knows to be slang for performing oral sex without a condom. Another post states: "X indicated that Brooklyn is a "Triple Threat", which your Affiant knows to be a slang term to mean that a female will allow a male prostitution customer to insert his penis into the female's mouth, her vagina, and her anus. Through your Affiant's training, knowledge and experience, I know that these terms are synonymous with sexual services requested by male customers and offered by females during prostitution dates.

28.     Once Detective Dickey obtained access to the membership portion of the TARGET WEBSITE, the profiles of the different females were available to be viewed. Under the "Erotic Massage Team" section, the different female's alias posting names are listed. By clicking on one of them, a large picture of that female is displayed. Under her picture is her posting name (note: these are not their actual names), the TARGET CELL PHONE number, their age, race, breast size, waist, height, weight, schedule availability and rates. Below this section there are usually several other pictures of the female in various stages of undress. In some of the pictures, the females, buttocks, breasts and genitalia are exposed and displayed. Below each

female's profile is a section where members can leave comments and reviews from their experiences.

29.      On November 8, 2018, your Affiant observed the member comments under the profile of "Cassandra". The reviewer using the screen name "James2" wrote a comment that included "The session was the best I have had. She is very sexy with that hair, and those eyes and Would recommend! Thanks X". Another reviewer using the screen name "drew1d" posted a comment about "Cassandra" that said "Red hair and great boobs. Can't wait to give her a try". Finally "lblake73" wrote a comment about "Hailey" that said "she was on fire and very horny! I will see her again soon and she tastes so good."

30.      On September 12, 2018, your Affiant conducted physical surveillance at the Days Inn in Elkton. On this day, Lee posted to the TARGET WEBSITE that he would have Sarah, Leia and Cassandra working on this day. Through a review of Lee's "friends" on Facebook and an observation of a distinctive tattoo on her leg, the female known as "Cassandra" was positively identified by law enforcement. "Cassandra", according to her personal Facebook profile and Texas-issued driver's license, is a resident of Wilmington, Delaware. "Cassandra" has since been regularly posted to Lee's website as being available or dates. It is still believed that "Cassandra" resides in Delaware.

31.      On March 8, 2019, your Affiant reviewed the target website and noted that "Cassandra" was posted as being available for dates on three different days during the prior two weeks.

32.      On March 7, 2019, your Affiant conducted surveillance at Lee's residence and the Days Inn. A female was observed several times exiting Lee's residence and entering a black Mercedes sedan bearing Maryland license plate 6CV1838. Through a review of a law

11

enforcement database, it was found that this vehicle was the subject of a Maryland State Police traffic stop in June 2018 and was driven by an identified, now 23 year old female. This female provided the State Trooper with her name, date of birth and her home address which is in Bear, Delaware. Based on Lee's posting to the TARGET WEBSITE earlier that day and comparing a photograph with the female observed at Lee's residence, this female is believed to be the same person that Lee has posted to his website as "Sydney".

33.     Based on "Sydney's" known identity, your Affiant also reviewed a domestic violence report taken by the Cecil County Sherriff's Office on February 17, 2019. This same female reported being a victim of domestic violence and provided to the Sherriff's Deputy her home address in Newark, Delaware. On March 8, 2019, "Sydney's" Facebook profile which she used to communicate with Lee lists that she currently lives in Newark, Delaware.

34.     In February 2019, your Affiant obtained a search warrant for the contents of Lee's Facebook account, www.facebook.com/Xavier.lee.5458. Through a review of Lee's Facebook messages, Lee has been communicating with the female known as "Sydney" since 2014. Through messages in January 2019, Lee asks "Sydney" if she wants to work for him. Based on these messages, Lee continues the conversation about working outside of the Facebook Messenger platform.

35.     During the surveillance on March 7, 2019, Lee was then observed transporting "Sydney" from his residence to the Days Inn in his Jeep, TARGET VEHICLE #2. After checking in at the Days Inn lobby, Lee pulled his vehicle into the back parking lot and entered room #209 with "Sydney". A few minutes later, a white Dodge pickup truck bearing Delaware license plate CL78214 entered the Days Inn parking lot. According to the Delaware Department of Motor Vehicles, this vehicle is registered to Last Stand Holdings with a physical address in

12

Delaware. A white male with a bald/shaved head exited the vehicle and walked to room #209 where he knocked on the door. He was let in and approximately one minute later, Lee was observed exiting the room. Lee entered TARGET VEHICLE #2 and departed from the hotel. The unidentified male remained in room #209 for approximately 1 hour and 20 minutes. At the same time that LEE returned to the Days Inn, the male exited room #209 and got into his truck. Your Affiant continued surveillance of this individual and observed him as he drove north on route 95 and crossed into the state of Delaware.

36.      Following the issuance of a subpoena to Enom, Inc. on October 22, 2018, this company identified themselves as being the registrar of the TARGET WEBSITE, www.wehavefuntimes.com. Being the registrar of the website means that Lee pays a fee to Enom, Inc. in order to use and access the domain name www.wehavefuntimes.com. Enom, Inc.'s response confirmed that this website was first registered by Xavier Lee through Enom, Inc. on October 5, 2011 using the phone number 443-466-6826 and email address imxavier@msn.com. Enom, Inc. also identified Lee's credit card used to pay for the domain registration fees and identified imxavier@me.com, as the email associated with his credit card.

37.      On October 4, 2018, an Administrative Subpoena was served on AT&T for telephone number 443-466-6826, the TARGET CELL PHONE. According to AT&T, the subscriber of this telephone number is Xavier Lee of 405 Buttonwoods Lane, Elkton, MD. Lee has been the subscriber of this number since August 6, 2008.

38.      On December 20, 2018 Endurance International Group responded to a subpoena for records relating to the TARGET WEBSITE. Endurance International is the company that hosts the TARGET WEBSITE. According to Endurance International Group, Inc. the TARGET WEBSITE is subscribed to by Xavier Lee with an address of 405 Buttonwoods Rd, Elkton, MD

13

21921 and uses telephone number 443-466-6826 (TARGET CELL PHONE) and email address imxavier@me.com.

39.     According to the records, Lee has the website www.snapguy.com registered in his name since May 7, 2008.  Since that time, Lee has registered several other domain names through Endurance International Group.  These include wehavefuntimes.com, sethandtrey.com, envisagerecords.com, whftbazaar.com, averagejoesfilleming.com, citygangbangs.com, dancinbooty.com, model4dollars.com and secretcams.com.   Lee is charged fees ranging from $9.95 and $14.99 to register these domains and pay for monthly website hosting fees.

40.     The domain www.wehavefuntimes.com (the TARGET WEBSITE) was first subscribed to by Lee for hosting services on January 13, 2010 under his primary www.snapguy.com account.  Endurance International Group provided the account records for Lee's website domains, to include snapguy.com, wehavefuntimes.com and model4dollars.com. The logs recorded that www.wehavefuntimes.com (the TARGET WEBSITE) was accessed on October 22, 2018 at 3:18pm GMT from IP address 24.126.99.140.  According to the results of a subpoena issued to Comcast on December 20, 2018, that IP address was assigned to the Comcast Internet subscriber Xavier Lee at 5 Hickory Lane, Elkton, MD 21921 with telephone number 443-466-6826 (Target Cell Phone).  This IP Address was assigned to Lee starting on July 13, 2018 through the date of the subpoena (December 20, 2018).

41.     In addition to this affidavit seeking authority to search the contents of the TARGET WEBSITE, it is requested that authority be granted to seize the website domain.  The seizure of the website is necessary to preserve evidence so that users who have access to the site will be unable to log in and alter or delete records.  Upon seizure of the website, individuals who enter the URL www.wehavefuntimes.com will be directed to a separate webpage stating that the

TARGET WEBSITE has been seized by the Federal Bureau of Investigation and Maryland State Police. A telephone number will also be provided in order for witnesses, victims or participants in the prostitution enterprise to call and provide information to law enforcement. *See* 18 U.S.C. §§ 2428; 981(a)(1)(C); & 2461.

## DAYS INN ROOM PREMISES

42.     On September 12, 2018, the FBI installed a surveillance camera ("pole cam") that faced the front of the hotel and could be focused on the hotel lobby, room #209, or the driveway where Lee and customers enter and exit the parking lot. In addition, during the week of September 3, 2018 the Maryland State Police installed a second pole cam that faced the rear of the hotel and could observe the activities in the rear parking lot.

43.     Starting August 2018, law enforcement conducted regular physical surveillance at the Days Inn. On most days, Lee was observed arriving just before 11:00 am with up to four females in his car. Lee would park his car in front of the lobby, enter the lobby and return to his car with what appeared to be a hotel room key. On several occasions, it took Lee less than one minute to exit his car, obtain the room key from the lobby and get back into his car. On almost every occasion Lee was observed by law enforcement checking into the Days Inn, RAJESHREE PATEL was the hotel employee who rented the room to Lee. Lee would then drive his car to the rear of the hotel and park in the same spot by the staircase. Lee would then walk up to room #209 with the females following him and enter room #209. On at least three occasions, Lee and the females were seen renting room #209 as well as additional rooms on the back side of the hotel. Lee and the females would then remain in the rooms for the first customers to arrive.

44.     Through physical surveillance and a review of the pole cameras, a pattern of behavior and actions was observed. Men would arrive to the hotel and park their cars. They would approach and knock on the door to room #209 or possibly a secondary room, the men would be let into the room, then about a minute later, Lee and various females would exit the room to go sit in Lee's vehicle. This would leave one female in the room with the apparent customer. After various amounts of time, including up to one hour, the men would leave the room and Lee would return with the other females to the room before the next male arrived.

45.     On August 9, 2018, physical surveillance observed a vehicle entering the parking lot and a white male entered room #209. Approximately 51 minutes later, the male exited. This male was positively identified through the license plate of the vehicle he was driving and his physical appearance and will be referred to herein as "Customer 1". On August 31, 2018, Customer 1 was interviewed at his residence. He stated that he met Lee, aka "X" at a sporting goods store in Delaware approximately five years earlier, where X told him that he runs a business in which women give massages. X gave Customer 1 a business card with the website TARGET WEBSITE listed as well as X's phone number, the TARGET CELL PHONE NUMBER. Customer 1 stated that he visited the TARTGET WEBSITE, www.wehavefuntimes.com, to see which girls were available on a certain day and call Lee on his cell phone to arrange a time to meet with a girl of his choice. On several occasions, Customer 1 drove to the Days Inn, met Lee in the hotel room and handed him $200 cash to a receive nude massage from the young females that were with Lee. Customer 1 did not disclose any sexual contact other than that the female's nude body rubbed against his nude body.

46.     On September 12, 2018 at approximately 1:28pm, a white male was observed parking in the Days Inn parking lot and knocking on the door to room #209. After being let in,

Lee was observed leaving the room and entering his vehicle. Approximately one hour later at 2:25pm, this male was seen leaving the parking lot. The license plate was recorded and was determined to be registered to Enterprise Rent-A-Car. On September 13, 2018, a Manager at Enterprise Rent-A-Car told me that this vehicle was rented in Atlantic City, NJ by an identified male, referred to herein as Customer 2, living near Philadelphia, PA. After obtaining Customer 2's Pennsylvania driver's license photograph, your Affiant was able to confirm the identity of the individual observed at the Days Inn. On September 13, 2018, Lee, posted to the TARGET WEBSITE the day's schedule and which females were available. Lee also posted a screen shot of a text message from September 12, 2018 at 2:30pm with a customer Lee identified by his username "dryan202003". Customer 2's identified true name is consistent and a close variation with the username Lee associated with the text. The message read as follows:

> Dryan202003 – Thx she is awesome. Amazing time and really great girl
>
> Lee – Thanks for the feedback she is amazing and beautiful
>
> Dryan202003 – Agreed on both. By far best experience I've had.
>
> Dryan202003 – Not that the other were not good. She is just on a different level
>
> Lee – Yea she's great and seems to keep getting better. Glad you had a great
>
> time. I'll be sure to let her know

47.     Following this posted message, a user with the screenname "Hoover7" posted a response to this message and asked which female "dryan202003" was asking about. The "Admin" responded "He was referring to Leia. She's great." The Administrator of the TARGET WEBSITE is believed to be Lee based on Witness 1's observations, the communications posted to the website between X and the customers, as well as the website registration information

identifying Lee as the registrar of the domain name. "Leia" has since been positively identified by law enforcement.

48.      During the interview of Witness 1, your Affiant was told that Lee regularly places a Go-Pro video camera on the window sill in the room and conceals it with the curtain. Witness 1 told me that LEE video records the customer dates when he has a new female working for him or if the customer is not known by Lee. Witness 1 also told me that Lee has instructed the females, in the presence of Witness 1, to look out the slightly opened curtain while having sex with the customers and look at Lee outside to let him know they are safe.

49.      On September 17, 2018, your affiant reviewed the website www.usasexguide.nl which is a public website and community forum where prostitution customers share information about their prostitution experiences. Your Affiant regularly reviews this website to read about a user's ratings of prostitutes, their apparent ages, rates for services provided, locations to meet new women and warnings about law enforcement activities. After accessing www.usasexguide.nl, your Affiant searched for the term "WHFT" (We Have Fun Times). Three of the comments identified by various users are as follows:

> 1. April 6, 2014 – 'Cephlapod Love' - "…There were some reports that the sessions were taped or watched via webcam on a laptop strategically placed…"
>
> 2. December 28, 2015 - 'Cephlapod Love' - …"Past reports suggest the room is bugged or a laptop is on transmitting from the cam on the 'puter…"
>
> 3. January 5, 2016 - 'Nymking' – "…I think a girl that used to work there said the webcam was on sometimes…"

50.      Based on the span of time between these public posts and information from

Witness 1 about the existence of recording devices in the hotel room, it is likely that electronic

recording devices are regularly used by Lee to monitor and record the activities in the hotel

room. See also information contained below.

51.      Through a review of additional posts made to the website www.usasexguide.nl,

users wrote that Lee directs them to the room and the customer pays Lee cash in advance. Two

of the comments identified from various users are as follows:

> 4.  April 6, 2014 – 'Cephlapod Love' - "…You meet X (and usually
>     another girl) at the incall location and give him the money and he
>     shows you to the room and the girl…"
>
> 5.  December 28, 2015 - 'Cephlapod Love' – "…X directs you to meet at
>     a hotel in the Newark area. When you get there he meets you and
>     takes your money (yes, pay up front) and then you see the girl in the
>     room."

52.      Through both physical surveillance and a review of the recorded pole camera

footage, Lee is observed in room #209 or a secondary room. Once the customer arrives, they

knock on the door to the room. On every occasion observed, the customer is let in and less than

one minute later Lee walks out of the room and returns to his vehicle parked in the back lot of

the hotel. Based on these observations and the above comments, it is probable that Lee is

collecting the cash from the customer and leaving the room with it. Based on my knowledge,

training and experience, your Affiant knows that funds for prostitution dates are collected before

the date begins. When the money is collected it is usually hidden, concealed or provided to

someone else to ensure that the money is not taken back or becomes the cause for a robbery.

19

53.     Through physical surveillance and review of the recorded pole camera footage, when the customer leaves room #209 or a secondary room, Lee is observed exiting his vehicle and returning to the hotel room. Upon return, Lee always used a room key to enter the room. The only time anyone else was observed using a room key was when Lee was inside the room and one of the females would leave for a brief period of time. Lee's subsequent return to the room is so timely, that it is reasonable to believe that he is either informed by the female that the customer is about to leave or he has some means of remotely monitoring the room to know that a date is over.

54.     Since the surveillance of Lee and the Days Inn began, a total of seventeen females have been identified as having worked for Lee over the past year. And there are at least four others who we have not identified. In addition, at least twenty-three customers have been positively identified.

55.     On September 19, 2018, Maryland State Police Cpl. Heid was conducting surveillance on the Days Inn and watching room #209. Cpl. Heid observed the Hotel maintenance worker moving in and out of room #209. The worker exited room #209 and threw a small bag of trash over the railing to the ground below. Cpl. Heid retrieved this bag from the ground where it landed and reviewed its contents at a separate location. Inside the bag was a used condom.

56.     Since the initiation of this investigation, physical surveillance has been conducted at the Days Inn on thirteen different days. On each of these days, Lee and his females have been seen with customers in room #209. Although at times they have been observed using other rooms at the Days Inn, it is always in addition to room #209. During days in which physical surveillance was not conducted, a remote review of the pole cameras has been conducted on

numerous occasions.  On these days, Lee has always occupied room #209.  On no occasions has surveillance shown that Lee and the females occupied a room at the Days Inn and not also occupied room #209.

57.      When the anticipated searches are conducted, a search of room #209 will only be executed upon visual confirmation that Lee or his known associated females are occupying room #209.  In the event that Lee or his known associated females are not at the hotel or if they are not observed in room #209, the search warrant for those premises will not be conducted.

## DAYS INN MANAGEMENT

58.      On August 15, 2018, SA Winn contacted the staff at the Days Inn under the pretext of looking for a bank robbery subject.  The hotel maintenance worker stated that the managers of the hotel were Rajeshree Patel (female, date of birth October 14, 1977, and social security number of XXX-XX-7977), and Ruhal Patel, (male, date of birth January 19,1971, and social security number of XXX-XX-3830), and provided SA Winn with their cell phone numbers.  The Patels are husband and wife and both are naturalized citizens of the United States of America.  SA Winn then spoke with Rajeshree Patel who said that she and her husband basically own and operate the hotel, but that Ruhal Patel's Aunt, Shobha Patel, actually owns the property.

59.      A review of the telephone records for Lee and the TARGET CELL PHONE during the period of January 9, 2015 to October 3, 2018 revealed that a total of 113 calls were made from Lee's TARGET CELL PHONE to the main number for the Days Inn.  In addition, two instances were noted in which the TARGET CELL PHONE communicated directly with the cell phone number provided for Rajeshree Patel.

60.     On October 31, 2018, your Affiant interviewed Rajeshree Patel under a ruse that an unknown bank robber was believed to have stayed at the hotel on certain dates. Patel was served with a subpoena for physical records, or notable lack thereof, pertaining to all registered hotel customers for dates which corresponded to days that Lee was physically surveilled to be at the hotel with the various females meeting customers in room #209. The subpoena included two different dates in August 2018 and one in October 2018. The subpoena also included the days prior to when Lee was observed in the event his early check-in was recorded in their system for the prior day.

61.     Through a review of the records provided by Patel on this day, Lee's name was not recorded renting any rooms. In addition, the records failed to reflect that room #209 was rented to anyone on the days Lee was observed to be occupying the room. Patel stated that all room rentals are entered into their computer and that the hotel does not have any long-term residents who essentially live at the hotel and their names are not entered into their computer system. Finally, Patel stated that they do not do hourly room rentals and they discourage local residents from renting a room for two or three days as historically the rooms are damaged and smoked in.

62.     During this interview, Patel stated that they were recently robbed. When asked about their video surveillance system and if it captured images of the robbery suspects, Patel told your Affiant that their video system maintains video for a period of approximately 30 days.

63.     Based on this information, it is expected that the Days Inn Office located at 311 Belle Hill Rd, Elkton, MD will contain video evidence of Lee renting rooms daily from the staff. In addition, there may be records relating to Lee and his daily rental of rooms from the hotel. Finally, by accessing their electronic hotel folio records, it is expected that Lee's name will not

22

be registered for any room rentals thereby showing that the hotel staff were attempting to conceal the room rentals to Lee and the associated daily income.

## MITSUBISHI LANCER – TARGET VEHICLE #1

64.     During surveillance on multiple occasions from August 2018 through January 2019, Lee has been observed driving to and from the hotel and transporting females who work for him in a 2008 Mitsubishi Lancer, bearing Maryland license plate 3EDV57 (TARGET VEHICLE #1). According to records obtained from the Maryland Motor Vehicle Administration (MVA), this vehicle was purchased by Lee's mother on April 19, 2008 and continues to be registered in her name to this day. The vehicle bears the Vehicle Identification Number (VIN) of JA3AU26U98U039705.

65.     In August 2018, the Maryland State Police obtained legal authority by a Cecil County Judge to install a tracking device on Lee's 2008 Mitsubishi Lancer, TARGET VEHICLE #1. Through a review of the data provided by the locations Lee traveled with the tracking device attached to his vehicle, Lee was regularly observed to travel between the TARGET residence, the Days Inn and numerous locations around the Elkton, MD area. One of the locations Lee was observed to travel was the Cecil County Health Department. Witness 1 told your Affiant that Lee regularly received free condoms from the Health Department and that the employees there would recognize Lee. Also, on several occasions the vehicle tracker data showed Lee's vehicle to be in the vicinity of the University of Delaware in Newark, DE.

66.     On October 2, 2018, a review of the TARGET WEBSITE revealed that "Tessa", "Sarah" and "Adrian" would be available for dates on this day. Surveillance was established at Lee's residence at this time when Lee and an identified female, using the alias "Leia" on the

TARGET WEBSITE, exited his residence and drove away in Lee's Mitsubishi. Surveilling
Agents/Officers followed Lee to the Delaware Authority for Regional Transit (DART) station at
the University of Delaware in Newark, DE where he picked up another identified female, using
the alias "Adrian". Lee then drove back towards the Days Inn and picked up a third female,
using the alias "Sarah" in the vicinity of the Elkton Cracker Barrel. Leia and Sarah had been
previously identified and were suspected of having outstanding warrants for their arrest.

      67.      With the assistance of Elkton Police Department, Lee's vehicle was stopped for
having an inoperable center brake light. During the stop, Lee and all three females were
positively identified. Through a check of NCIC, the Elkton Officers determined that all three
females had outstanding warrants and each was arrested for either violation of probation or
failure to appear charges. During the traffic stop, as each female was taken out of Lee's vehicle,
it was observed that Lee was in possession of each of their cell phone batteries. Based on my
training, knowledge, and experience, I know that sex traffickers and people who prostitute others
often retain control of their victims' personal belongings or means of communication with
others, particularly cell phones, as a means of control over the person. Lee was later observed at
the Elkton Police Department to determine when each female would be released and appeared at
the Commissioner's Office to speak with the females and learn about their release status.

      68.      Following the traffic stop, Adrian told an Officer that Lee and the other vehicle
occupants all worked at Applebee's and that LEE, their manager, was picking them up to take
them to work. Later, Adrian was upset and told an Elkton Detective that she needed to be
released in order to tell her boss that she was arrested. The Detective reminded Adrian that she
was with her boss when she was arrested so he was already aware of her arrest. During a

continued surveillance that afternoon, the only female observed to be working at the Days Inn was "Tessa".

69.      Following the arrest of "Sarah", she called Lee on the TARGET CELL PHONE number from the Cecil County Detention Center. Your Affiant listened to this recorded jail call on November 28, 2018. During the call, she identifies herself to Lee as "Sarah" and asked Lee if he would post bail for her. Lee asked her for her actual first and last name, which "Sarah" did provide. Lee told "Sarah" to wait until she knows her actual bail amount and then contact him for the money. "Sarah" then states that she will work every day. Lee interrupts "Sarah" saying, "ok, wait, wait, wait, stop, stop, stop". "Sarah" then continues that she would work at her job at the "restaurant" to earn money to pay him back. Your Affiant believes that "Sarah" was agreeing to work as a prostitute for Lee in order to earn money back for the bail he would post. Lee knew this call was recorded and interrupted her so she would not say anything incriminating. "Sarah" then inserts the comment about working at the restaurant because following the vehicle stop, "Adrian" had told the Elkton Police Detective that Lee was their manager and they all worked at Applebee's

## JEEP GRAND CHEROKEE – TARGET VEHICLE #2

70.      The following day (October 3, 2018), Lee only posted "Tessa's" name on his website, the TARGET WEBSITE, as being available for dates. On October 3, 2018, your Affiant reviewed video footage from the pole cam installed facing the rear of the hotel. Lee was observed with the female believed to be Tessa at the rear of the hotel. On this day, Lee was driving a white Jeep Grand Cherokee, TARGET VEHICLE #2. This was presumably because of the vehicle stop on the day prior and because he was given a service repair order from the Elkton Police Officer. Through a review of subpoenaed financial records received from PayPal, on

25

October 4, 2018, Lee did purchase a "2008-2015 Mitsubishi Lancer 09-12 Galant Third 3rd

Brake Light Lamp Trunk Mount" for $40.74.

71.     On October 11, 2018, surveillance was again conducted on Lee. Through a

review of the TARGET WEBSITE's schedule for this day, it was noted that "Adrian" was listed

as being available for dates. Knowing that "Adrian" was previously picked up by Lee at the

DART station in Newark, DE, Agents/Officers initiated surveillance at that location. Upon

arrival, "Adrian" was already waiting at the bus stop. A few minutes later, Lee was observed

arriving in the TARGET VEHICLE #2, bearing Maryland license plate 8CP0647 and pulling up

to the bus stop. Surveillance photographs were taken as "Adrian" walked to the vehicle and

drove away with Lee. Lee and the TARGET VEHICLE #2 were surveilled to be driving to the

vicinity of the Days Inn in Elkton when the surveillance was then terminated. A subsequent

review of the video footage from the rear pole camera was conducted. The reviewed video

footage showed that Lee and "Adrian" parked behind the Days Inn and exited the vehicle. On

three subsequent days, a review of the pole camera footage showed Lee was driving TARGET

VEHICLE #2 to the Days Inn and transporting at least one other female to and from the hotel

during the day. On these days, the TARGET WEBSITE contained messages where Lee posted

he had females available to see customers.

72.     According to the Maryland Vehicle Administration (MVA), TARGET VEHICLE

#2 was purchased on October 18, 2016 by Xavier Lee. The vehicle has been identified as

bearing Vehicle Identification Number (VIN) 1C4RJFJG3HC647103.

73.     On December 3, 2018, pursuant to a subpoena, PNC Bank provided financial

records relating to accounts associated with Lee. Through a review of these records, an auto loan

was initiated by Lee on October 18, 2018 for TARGET VEHICLE #2 in the amount of

$54,434.50. Lee's monthly payment to PNC Bank is $818. Through a review of these records,

Lee makes one deposit per month into PNC account # XX-XXXX-9832 for amounts between

$400 and $903. The money is then transferred into the PNC auto loan account,

#XXXXXXXX0411, to pay down the loan balance.

## LEE'S RESIDENCE

74.        Witness 1 told your Affiant that Lee currently resides at 5 Hickory Lane, Elkton,

MD, the TARGET RESIDENCE. Lee lives with his eldest son and his sister who runs a small

business out of the home. Starting on August 9, 2018, surveillance was conducted in the vicinity

of the TARGET RESIDENCE. This residence is a brick front townhouse with two additional

units to the right of it and three units to the left of it. There are approximately two parking

spaces in front of each residence.

75.        On January 10, 2019, parked in front of the TARGET RESIDENCE was a white

Mitsubishi Lancer bearing Maryland license plate 3EDV057 (TARGET VEHICLE #1) as well as

a white Jeep Cherokee bearing Maryland license plate 8CP0647 (TARGET VEHICLE #2).

According to the Maryland Vehicle Administration (MVA), these vehicles are registered to

Xavier Lee and Debra Lynn Matthews of 405 Buttonwoods Rd, Elkton, MD, respectively.

Matthews is Lee's mother. At the time that the Maryland State Police both installed and

uninstalled the vehicle tracker on Lee's TARGET VEHICLE #1, it was parked in front of the

TARGET RESIDENCE.

76.        On August 9, 2018 and October 2, 2018, physical surveillance was conducted on

the TARGET RESIDENCE. During both days, both TARGET VEHICLE #1 and TARGET

VEHICLE #2 were parked in front of the residence. Lee was observed exiting the residence

each time with a different female. Through a review of the TARGET WEBSITE on that

morning, Lee posted which females would be available on those days. On August 9, 2018,

"Candy" and "Chelsea" were posted and on October 2, 2018, "Adrian", "Tessa" and "Sarah"

were posted. Lee was then surveilled picking up the other women and driving them to the Days

Inn where surveillance observed them staying in room #209 and meeting with various men.

77.     Witness 1 told me that Lee is an avid photographer and maintains a photography

studio in the basement of his residence. On October 30, 2018, your Affiant spoke with a former

neighbor of Lee's. This neighbor knew Lee was a photographer through their conversations with

him and would see flashes come from the house when they believed Lee was involved in a

photography session. This neighbor would also hear Lee yelling at women from inside his

residence.

78.     Your Affiant has reviewed the profiles for females Lee advertised on the

TARGET WEBSITE. During a review of the profile pictures for "Hailey", I observed six

photographs of this female posing in front of a window. The view outside this window is of

several units of townhouses with parking spaces in front of them, some with brick fronts others

with siding. The TARGET RESIDENCE is located on Hickory Lane at a point where it bends

slightly to the left. The view of the street outside the window in the pictures of "Hailey" is

consistent with the fashion in which the TARGET RESIDENCE is situated on Hickory Lane.

79.     Through a review of the profile photographs of the other women posted on the

TARGET WEBSITE, your Affiant has observed furniture, doorways and rooms that appear

consistent to each other. It is believed that these profile pictures of the females are also taken

inside the TARGET RESIDENCE. For example, in the profile pictures for "Cassandra" and

"Amber", pictures are taken in a doorway with white trim. In the background, a brown piece of

furniture, similar to a child's crib, can be seen.  Inside the crib in both pictures are pink and blue blankets and pillows.  Witness 1 confirmed that Lee takes profile pictures of the females for the website inside the TARGET RESIDENCE.

80.     On March 7, 2019, while conducting physical surveillance on the TARGET RESIDENCE, your Affiant was continuously checking the TARGET WEBSITE for the daily message Lee posts about which females would be available.  On this day, Lee posted the daily schedule indicating that "Sydney" would be available on this day.  A short time later, Lee and female identified as "Sydney" were observed exiting the TARGET RESIDENCE and getting into Lee's Jeep, TARGET VEHICLE #2.  Based on these events, it was clear that Lee connected to the TARGET WEBSITE from inside his residence to post the day's schedule.

81.     According to Witness 1, after Lee brings on a new female, he enters their true name in his phone.  In addition, Lee will enter their phone number, the day they started working for him and that they are associated with the TARGET WEBSITE.

82.     On October 11, 2018, Witness 1 told me that they were in Lee's home recently and sitting in front of his computer.  Witness 1 observed a thumbnail image of what they believed to be the room at the Days Inn that Lee rents.  Upon clicking on the icon, Witness 1 watched as a video began playing of a man having sex with one of the females that worked for Lee in the room at the Days Inn that Witness 1 has been in before with Lee.  Witness 1 did not recall who that female was.  Witness 1 asked Lee about the video and he told Witness 1 he uses a Go-Pro camera to video record the dates his females have, especially with new customers. Witness 1 asked Lee why he saved the video and he responded that he saves all of the videos he records.

83.     Witness 1 recalled seeing a large external hard drive attached to Lee's computer. Lee told Witness 1 that the drive contains approximately five hard drives on which Lee saves all of his videos and pictures. Lee told Witness 1 that after he records a date between a customer and one of the females, Lee removes the SD card from the Go-Pro camera and downloads the video to the large external hard drive. Witness 1 believes that Lee uses some type of fingerprint biometric device in order to unlock his computer or the hard drives.

84.     Witness 1 observed Lee while he was attempting to recruit new females to work for him. Lee usually takes the females to lunch to slowly talk to them about his business. He eventually explains that they will be having sex with men. Before he allows them to see any customers, Lee wants to have sex with them first. Lee either has sex with them in his car, in the hotel or inside the TARGET RESIDENCE.

85.     According to Witness 1, once Lee feels comfortable with the newly recruited female and that they want to work for him, Lee has them spend a day or two with him and the other females at the hotel. Although they are not allowed to see any customers, Lee wants to make sure that they will get along with the other females and not create conflicts.

86.     In January 2019, a Federal search warrant was authorized for the search of Lee's Facebook account www.facebook.com/xavier.lee.5458. Through a review of messages contained in the returns, Lee was communicating with many different women, some of which he offered money in order to have sex with them. Through the messages, it is apparent that some of these females previously worked as prostitutes for Lee in the past and their sexual encounters with Lee and others had been photographed or video recorded by Lee. During one message with a particular Facebook user (Facebook User 1), the female asks if Lee still had explicit videos of the female and asked Lee to delete them. Lee states "I have taken tons of videos of people over

the years" and that no one has "ever seen" any of them. Lee assures the female that she is "safe". In another Facebook message, Lee told the female user that he has over 60,000 videos and pictures that he has taken over the years.

87.     Through a review of a Cecil County Police report from 2014, your Affiant learned that Lee was involved in a personal physical relationship with an identified, then 16 year old female (Minor Female 1). Minor Female 1 is currently 21 years old. The existence of Minor Female 1's relationship with Lee was confirmed through a telephonic interview of Minor Female 1's father. Through a review of Lee's Facebook messages, he had communications with Minor Female 1 in 2015 and 2017. In the 2015 communications, Lee reminisced about their relationship and wrote about how he loved her. Lee asks Minor Female 1 for images of herself and she responds by sending several pictures of her face. One picture Minor Female 1 sent was of a nude female lying on her back. Because the face of the female was not showing, this female could not be identified. This female's genitalia was not displayed in a lewd or lascivious manner. Lee also tells Minor Female 1 that "I know you need some dick" and "And I need some of you again."

88.     In 2017, Lee had another Facebook discussion with Minor Female 1. The following messages were transmitted:

Minor Female 1 – "U can't sit here and expect me not to say shit if u still have old videos of me while u got a girl"

Lee – "She knows they there"

Minor Female 1 – "I don't care I don't want them here"

Minor Female 1 – "There"

Lee – "I can't delete my past"

Minor Female 1 – "They are of me I'm not apart [sic] of u any more…"

Lee – "I have a lot of old stuff"

Lee - "Like I said it's my life and my memories I don't delete that stuff"

Lee – "Never have"

89.     One month after this conversation, Lee and Minor Female 1 exchanged additional messages through Facebook.  The following messages were transmitted:

Minor Female 1 – "I was fuckin 16 when I met u I was a fuckin child"

Lee – "Yup and you still are"

Minor Female 1 – "Fuckin a 16 year old lol most normal people do that to I guess"

Lee – "No I'm definitely not thanks tho"

90.     Later in 2017, Lee had another Facebook discussion with Minor Female 1.  The following messages were transmitted:

Lee - "I need to see you squirt again".

Minor Female 1 - "what u miss about it"

Lee - "The noises you make your face and watching it come out".

91.     Based on Lee's apparent prior sexual relationship with Minor Female 1, combined with his proclivity to record his sexual encounters and save the files, it is likely that through the evidence review, images of Minor Female 1 engaging in sexual activity with Lee will be located. These recordings, because they will depict a female under the age of 18, would constitute child pornography under Title 18 U.S.C. § 2251(a) (production of child pornography) and Title 18 U.S.C. § 2252(A)(5)(B) (possession of child pornography).

## **RECRUITMENT OF UNDERCOVER OFFICER**

92.     On December 17, 2018 a female undercover officer (UCO) was sent into the lobby of the Days Inn in Elkton to rent a room. The UCO requested a room on the first floor in the back of the hotel. This was done so that the UCO's room could be close to where Lee parks his car and waits while his females are seeing customers in the hotel rooms. After the UCO arrived in the room, Lee posted on the Target Website that he would have three females working this day: Tessa, Angelina, and Nadia. A short time later, Lee was observed arriving at the hotel with one female in his car. Lee met two others females in the rear parking lot who had driven themselves to the hotel. Lee rented room #209 and the room next door to the UCO.

93.     Throughout the day, and during times when Lee was observed in the vicinity of the rear parking lot, three plain clothes Detectives arrived at the UCO's hotel room and posed as prostitution customers. They knocked on the UCO's door, entered the room for approximately 20 – 30 minutes, and then left. Lee observed this activity and approached the UCO to discuss what she was doing. During their discussion, the UCO told Lee that she was seeing prostitution customers. Lee asked to meet with the UCO to discuss their mutual interests.

94.     At the request of Lee, he and the UCO, wearing a concealed recording device, met in person at the nearby McDonalds where Lee told the UCO that he has various females working for him. Lee explained that he operates the TARGET WEBSITE and arranges the dates for his girls with subscribers of his website. Lee stated he meets the customers in the room and collects the fee, typically $200, and then the customer and the female are left alone in the room for an hour. Lee explained that he splits the money with the females evenly and shares the expense of the hotel room. Lee showed the UCO four videos he had recorded on his iPhone in which the females counted cash that they received that day from Lee. Following this meeting with Lee, the UCO was shown pictures of the females identified thus far to be working for Lee

33

and the UCO recognized four of the identified females as being depicted in the videos shown to them by Lee.

95.     On December 19, 2018, Lee sent a text message to the UCO for her to call him. During this recorded telephone call to the Target Cell Phone, Lee and the UCO further discussed his business. Lee attempted to recruit the UCO to work for him and encouraged her to meet him and the females to see how it all works. During the call, Lee stated he provides the condoms for dates, unless the female has a latex allergy. The UCO then questions Lee if "head is not covered but everything else is?" and Lee responds "Yes". Based on your Affiant's training, knowledge, and experience, the UCO was asking Lee if she would be expected to perform fellatio on a male penis without a condom and if all other sex acts will be performed with a condom on the male's penis. Lee affirmatively responds and confirms this is what they discussed during their meeting in McDonalds on December 17, 2018.

96.     The UCO then asks Lee if she is allowed to be "fetish friendly" and if she is expected to perform anal sex. Lee responds that anal sex is usually an extra charge for the customer to pay and that is the only extra act paid for by the customer that Lee does not take a percentage of. Lee encourages his females to talk to the male clients and suggests that they charge an additional $80 for anal sex.

97.     The UCO then asked Lee what she should do with the customers for an hour or ninety minute long appointment. Lee responds that the customer is paying for the females' time and that if the customer wants to have sex with her three times during their time, then that is fine. Lee then talks openly to a female who is apparently sitting next to him and who had recently performed a ninety minute date. Over the recorded phone call, the female can be heard in the background telling Lee that she gave her customer "head" (oral sex) and then they talked for a

34

while, then she gave him "head" (oral sex) again. Lee told the UCO that in a ninety minute appointment, the female only did "sex-stuff" for 30 – 35 minutes.

## **FINANCIAL ACCOUNTS**

98.    According to the TARGET WEBSITE, Lee's rates start at $200 per hour and that females are available at the hotel from 11:00am to 6:00pm. Witness 1 told SA Winn that Lee splits proceeds of each date equally with the females. However, for the first date of the day, Witness 1 advised that Lee takes an additional $70 of the females' portion to cover the cost of the room rental. If Lee were to have a $200 customer come every hour, the total revenue for the day would be $1,400. In that scenario, Lee would receive $770 as his portion. This would result in him earning approximately $200,200 per year ($770 per day, 5 days per week and 52 weeks per year). Additionally, if Lee did pay $70 per day to rent a room at the Days Inn, this would result in approximately $18,200 of annual income for the Days Inn from Lee's one room alone ($70 per day, 5 days per week, 52 weeks). Lee often reserves and uses additional rooms, but for the sake of simplicity, these calculations are based on only one room's revenues. Accordingly, Lee's and the hotel's actual revenues could be higher.

99.    Witness 1 told SA Winn that Lee drives to two different banks once a week to deposit money received during the week. One bank is a PNC Bank and the other is believed to be a Howard Bank based on their description of its location. Witness 1 also told SA Winn that Lee does not have any other legitimate employment in which he earns income. A search of Maryland Department of Labor, Licensing and Regulation records showed that Lee did not report any wages to the state of Maryland during at least the previous 12 months.

100.     On November 19, 2018, your Affiant received records from Howard Bank
pursuant to a subpoena.  These records included five different accounts in the name of Xavier
Lee using the mailing address of 405 Buttonwoods, Elkton, MD.  Through review of the account
ending in 6376, Lee makes deposits approximately once per week or once every other week.
Through a review of the deposits for the calendar year 2018, Lee's total cash deposits in Howard
Bank for the year were $52,575 with an average cash deposit per month of $6,024.  All of the
deposits were in the form of cash and no other apparent source of income were deposited into
Lee's accounts.  Deposits were made to the accounts on twenty-six different days.  A total of 17
of these deposits were made on Mondays.

101.     On December 3, 2018 your Affiant received records from PNC Bank pursuant to
a subpoena.  These records included three different accounts in the name of Xavier Lee using the
address of 5 Hickory Lane, Elkton, MD with a home phone number of 443-466-6826 and an
email address of imxavier@me.com.  Through a review of the account number XX-XXXX-
9832, records show that Lee deposits approximately $800 cash through the automated teller
machine (ATM) once a month.  The funds are then transferred through an on-line payment
system to his PNC Bank auto loan account.  Beyond these transactions, there is little to no other
activity in Lee's accounts.

102.     On November 19, 2018, Stash Investments provided their response to a subpoena
for records relating to accounts associated with Lee.  Through a review of these records, Stash
Investments provided account records that Lee opened an account with Stash Investments in
May 2018.  The Account Information sheet shows the account is owned by Xavier Lee, born
January 12, 1979 and residing at 5 Hickory Ln, Elkton, MD.  The phone number for Lee is listed
as 443-466-6826 (TARGET CELL PHONE) and he indicates he is employed by "Snapguy"

earning between $50,000 and $100,000 per year as a photographer. Lee provides his contact email address as imxavier@msn.com, the TARGET EMAIL #2.

103.        An administrative subpoena was the issued to PayPal for records relating to financial transactions associated with Lee's account. On November 26, 2018, PayPal provided their response to the subpoena for accounts owned by Lee. One of these accounts (#XXXXXXXXXXXXXXXX2216) contained the following registration information:

Name: Xavier Lee

Date of Birth: 12-Jan-79

Business Name: We Have Fun Times

Phone: 443-466-6826 (TARGET CELL PHONE)

Email: imxavier@me.com (TARGET EMAIL #1)

SSN: XXX-XX-9447

Address: 5 Hickory Ln, Elkton, MD 21921 (TARGET RESIDENCE)

104.        Through a review of one of the PayPal accounts, numerous transactions were identified where named subscribers were paying a monthly fee to have access to an adult pornography website run by Lee named www.whftbazaar.com. As of January 22, 2018, this website is no longer active.

## APPLE RECORDS

105.        On December 8, 2018, Apple, Inc. provided their response to a subpoena for records relating to the email account imxavier@me.com. Through a review of their response, Apple, Inc. identified that account number 1042284646 was created on October 13, 2011 by Xavier Lee. The address associated with this account is identified as 5 Hickory Ln, Elkton, MD with a telephone number of 443-466-6826, TARGET CELL PHONE. The most recent cell

phone assigned to the account was identified as a silver 256GB iPhone X, serial number GHKWTAZPJCL9 which was purchased on November 11, 2017. Records also showed that Lee purchased a grey 256GB iPad Pro 11, serial number DMPXL0T9KD8C.

106.    Through a review of the TARGET WEBSITE on November 7, 2018, a post was made with the daily schedule of which girls would be available for that day. The post on this day read, "Sorry for the late update I had to spend some time waiting in line from 8am at the Apple store to get the new iPad". This post about his purchase of an iPad is consistent with the Apple, Inc. registration records that Lee registered a new iPad to his Apple account.

107.    The Apple, Inc. subpoena response provided records relating to Lee logging into the Apple Gamecenter. The logs show Lee logging into the Gamecenter and the duration of each session between October 30, 2018 and November 2, 2018. Apple, Inc. identified Lee's Gamecenter nickname as "Hustle Hard!"

## SUMMARY

108.    Your affiant knows through his knowledge, training and experience that subjects will use electronic communication accounts and social media during the commission of these crimes to communicate with anyone assisting in the criminal act. In addition, participants in a prostitution enterprise will utilize vehicles to transport females to and from hotel rooms where they perform commercial sex acts. Those involved in prostitution will also record photographs and videos of the females involved in prostitution using their cell phones, tablets and cameras, and keep records or trophies of the criminal acts on these devices. Those involved in prostitution will, many times, transfer their cell phone data to computers and social networking sites to display their work to attract attention from admirers.

109.    Your affiant knows that individuals involved in prostitution, including Human

Traffickers, victims of human trafficking, pimps and females working as prostitutes, utilize

iPods, tablets, and cell phones that can be connected wirelessly to the Internet. These devices are

used to send and receive emails, search and post prostitution advertisements, communicate with

customers through telephone calls and text messages, communicate with other members of the

prostitution organization, download texting applications (apps) and take pictures or videos of

those involved in prostitution.

110.    The communications that targets and females involved in prostitution have with

customers occur through telephone calls, text messaging applications, and email

communications. These communications include discussions about when and where to meet,

how much the customer will pay for time with the victim as well as what sex acts will occur

when they meet. Those working in prostitution will also communicate with their pimps to let

them know things like when a customer is coming; how much he is paying; when the customer is

done so the pimp can return to the room; arrangements to rent and pay for hotel rooms; postings

of prostitution ads on the Internet; and issues related to the victims' personal needs such as

meals, hygiene products, and drugs or cigarettes.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

111.    I anticipate executing the warrants on the subject residence, vehicles, devices,

website and hotel room which should contain copies of records and other information (including

the content of communications) particularly described in Section I of Attachments B-1 through

B-8 of the warrant. Upon receipt of the information described in Attachments B-1, through B-8

government-authorized persons will review that information to locate the items described in

Attachments B-1 through B-8.

## WEHAVEFUNTIMES.COM DOMAIN NAME SEIZURE PROCEDURE

112.    Attachments A-1 and B-1 relate to the TARGET WEBSITE to be searched and seized.

113.    As detailed in attachment B-1, upon execution of the requested seizure warrants, Endurance International Group will be directed to restrain and lock the TARGET WEBSITE as listed in attachment B-1, as evidence of this criminal investigation and prosecution, pending the transfer of all rights, title, and interest in the TARGET WEBSITE to the United States upon resolution of forfeiture proceedings. This will be done to ensure that no changes can be made to the TARGET WEBSITE absent a court order or, if forfeited to the United States through subsequent proceedings, without prior consultation with the U.S. Marshal's Service.

114.    In addition, upon seizure of the TARGET WEBSITE, Endurance International Group will be directed to point the TARGET WEBSITE to a particular IP address, which will display a web page notifying users, including the registrants, of the seizure of the TARGET WEBSITE. This "splash page" will feature a hotline phone number for people to call with information.

115.    The seizure warrant for the TARGET WEBSITE is appropriate under the authority of 18 U.S.C. §§ 2428; 981(a)(1)(C); and 2461. This Court has jurisdiction over the seizure and subsequent forfeiture action under 28 U.S.C. § 1355.

## CONCLUSION

116.    Based upon all of the information set forth in this application, I respectfully submit that there is probable cause to believe that Xavier Lee, violated 18 U.S.C. § 1952(a)(3). This affidavit therefore supports the attached criminal complaint.

117.    Also, based on my training and experience, and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that the subject residence, vehicles, devices, website and hotel locations contain evidence of violations of 18 U.S.C. §§ 2422(a); 1952(a)(3); 1956; 2251(a); and 2252(A)(5)(B). Accordingly, search warrants are requested. *See* Fed. R. Crim. Pro 41.

118.    This Court has jurisdiction to issue the requested warrants to search records on the subject accounts because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711(3) and 18 U.S.C. §§ 2703(a), (b)(l)(A) & (c)(1)(A).  Specifically, the Court is a "district court of the United States that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(I).

Respectfully Submitted,

Patrick T. Winn Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on March _12_, 2019

Honorable Judge Stephanie A. Gallagher
United States Magistrate Judge

## ATTACHMENT A-1

## DESCRIPTION OF LOCATION TO BE SEARCHED AND SEIZED

(Endurance International Group)

This warrant applies to information associated with the Endurance International Group hosted website and domain name:

www.wehavefuntimes.com

that is stored at premises owned, maintained, controlled, or operated by Endurance International Group, a business with offices located at Endurance International Group, 1500 North Priest Drive, Suite #200, Tempe, AZ, 85281

International Group is required to disclose the following information to the government for each account or identifier listed in Attachment A-1, with or without the technical assistance of the FBI, while the associated website is online and prior to the seizure of this website as outlined in the associated seizure warrant;

1. all records or other information pertaining to that account or identifier, including the full content of all files, databases, database records, backups, snapshots or other preserved copies of data stored by Endurance International Group in relation to that account or identifier;

2. Records of user activity for each connection made to or from the Target Accounts, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses, and any telephone, instrument or other unique identifiers collected by the Target ISP and associated with the Target Accounts;

3. All information about each communication sent or received by the Account, including the date and time of the communication, the method of communication, and the source and destination of the communication (such as source and destination email addresses, IP addresses, and telephone numbers);

4. The contents of all e-mails stored in the account, to include but not limited to admin@wehavefuntimes.com, including copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

5. Any deleted emails, including any deleted information described in subparagraph "d," above;

6. all Random Access Memory data associated with the account or identifier;

7. all information in the possession of Endurance International Group that might identify the subscribers related to the account or identifier, including names, addresses, telephone numbers and other identifiers, e-mail addresses, business information, the length of service (including start date), means and source of any and all payments for

services (including any credit card or bank account number), and information about any domain name registration;

8.  all records pertaining to the types of service utilized by the user of the account or identifier;

9.  all records pertaining to communications between Endurance International Group and any person regarding the account or identifier, including contacts with support services and records of actions taken.

**II.    Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 1952(a)(3) (Use of Interstate Facilities to Promote Business Enterprise involving Prostitution Offenses; 2422(a) (Persuasion, Induction, Enticement, and Coercion to Travel in Interstate Commerce to Engage in Prostitution and Criminal Sexual Activity); 2251(a) (Production of Child Pornography); and 2252(A)(5)(B) (Possession of Child Pornography), relating to the development, publishing, advertisement, access, use, administration or maintenance of any virtual private server enumerated in Attachment A-1, for the period of **August 1, 2015 to the present** date, including:

1.    The full content of the website identified in Attachment A-1 containing video files, postings, messages, images, recruitment, scheduling, discussion forums, photo galleries, participant identities and account users in furtherance or execution of an unlawful prostitution enterprise related to the target website;

2.    All records or other information that would identify or assist in identifying the administrators and users of those websites and the web hosting service account associated with the data and information on the item to be searched;

3.    Files, databases, and database records stored by Endurance International Group on behalf of the subscriber or user operating the website, including:

    a.  programming code used to serve or process requests made via web browsers;

4

b. HTML, CSS, JavaScript, image files, or other files;

c. HTTP request and error logs;

d. SSH, FTP, or Telnet logs showing connections related to the website, and any other transactional information, including records of session times and durations, log files, dates and times of connecting, methods of connecting, and ports;

e. MySQL, PostgreSQL, or other databases related to the website;

f. email accounts and the contents thereof, associated with the account;

4.     Subscriber information related to the accounts established to host the site enumerated in Attachment A-1, to include:

a. Names, physical addresses, telephone numbers and other identifiers, email addresses, and business information;

b. Length of service (including start date), types of service utilized, means and source of payment for services (including any credit card or back account number), and billing and payment information;

c. If a domain name was registered on behalf of the subscriber, the date that the domain was registered, the domain name, the registrant information, administrative contact information, the technical contact information and billing contact used to register the domain and the method of payment tendered to secure and register the Internet domain name.

d. Records relating to the purchase or placement of advertisements for commercial sex;

e. Records relating to the purchase or use of stored value cards, gift cards, and other financial instruments which may be used to purchase advertisements for commercial sex;

f. Records relating to the solicitation of customers for commercial sex;

g. Records relating to the scheduling of appointments for commercial sex;

h. Records relating to the travel or transportation of individuals to engage in commercial sex;

     i.   Records relating to sexually explicit or suggestive images of minors that may be used in furtherance of commercial sex trafficking;

     j.   Records relating to the recruitment, enticement, solicitation or coercion of individuals to engage in commercial sex;

     k.  Records relating to the fruits or instrumentalities of commercial sex trafficking, including currency and other financial instruments, jewelry, vehicles, controlled substances, and firearms.

5.     Any and all communications between users and administrators, publicly posted comments or messages, deleted comments messages or other deleted yet retained content, uploaded photo or video images, links to external websites, identification of registered website users, historical log-in records for website users.

## III.   Search Methodology

With respect to the search of the information provided pursuant to this warrant by the above-referenced provider, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically-stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.

## ATTACHMENT A-2

## DESCRIPTION OF LOCATION TO BE SEARCHED

(Xavier Lee's Residence)

This warrant applies to information associated with the residence of Xavier Lee located at:

**5 Hickory Lane, Elkton, MD 21921**

It is further described as a two-story attached townhome with a brick front. The front of the house has green shutters on the second story front windows. The green front door is off-set to the right and has a large number "5" affixed to the top of it. The residence is the third unit from the right in a row of six townhouse units.



**ATTACHMENT B-2**

**PARTICULAR THINGS TO BE SEIZED**

(Xavier Lee's residence)

All items and information found in any of the subject locations described in Attachments A-2, that are evidence of a crime, contraband or fruits of a crime, or property designed, intended for use, or used in committing a crime, and specifically the crimes 18 U.S.C. §§ 1952(a)(3) (Use of Interstate Facilities to Promote Business Enterprise involving Prostitution Offenses; 2422(a) (Persuasion, Induction, Enticement, and Coercion to Travel in Interstate Commerce to Engage in Prostitution and Criminal Sexual Activity); 2251(a) (Production of Child Pornography); and 2252(A)(5)(B) (Possession of Child Pornography), including the following:

1.     Computer(s), computer hardware, software, related documentation, passwords, data security devices (as described below), videotapes, and/or video recording devices, and data that may constitute instrumentalities of, or contain evidence related to, this crime. The following definitions apply to the terms as set out in this affidavit and attachment:

a.     Computer hardware: Computer hardware consists of all equipment, which can receive, capture, collect analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Hardware includes any data processing devices (including but not limited to cellular telephones, central processing units, laptops, tablets, eReaders, notes, iPads, and iPods; internal and peripheral storage devices such as external hard drives, thumb drives, SD cards, flash drives, USB storage devices, CDs and DVDs, and other memory storage devices); peripheral input/output devices (including but not limited to keyboards, printer, video display monitors, and related communication devices such as cables and connections), as well as any device mechanisms, or parts that can be used to restrict access to computer hardware (including but not limited to physical keys and locks).

b.     Computer software is digital information, which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

c.     Documentation: Computer related documentation consists of written, recorded printed, or electronically stored material, which explains, or illustrates how to configure or use computer hardware, software, or other related items.

d.     Passwords and Data Security Devices: Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation or data. Data security devices may consist of hardware, software or other programming code.

8

2.    Any and all notes, documents, records, or correspondence pertaining to use of interstate facilities used to manage or operate a prostitution enterprise as defined under 18 U.S.C. § 2422(a), 1952(a)(3), § 1956, § 2251(a) and § 2252(A)(5)(B).

3.    Any and all correspondence identifying persons transmitting, receiving or possessing, through interstate commerce including by U.S. Mails or by computer, any evidence of an enterprise involved in recruitment, advertising and engaging in a prostitution enterprise as defined under 18 U.S.C. § 2242(a), 1952(a)(3), § 1956, § 2251(a) and § 2252(A)(5)(B)..

4.    Any and all records, documents, invoices and materials that concern any accounts with Comcast, or any other Internet Service Provider, screen names, online accounts, or email accounts.

5.    Books, records, receipts, bank statements and records, money order and cashiers' checks, passbooks, bank check, safe deposit keys, pre-paid credit cards and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and or expenditure of money including but not limited to records regarding the use of prepaid bank cards or the transfer of money such as Western Union.

6.    Any and all United States Currency.

7.    Address and/or telephone books, rolodex indices, papers reflecting the identity, names, address and/or telephone numbers of possible co-conspirators, possible prostitution customers and of females involved in, or solicited to be involved in prostitution, and business information from entities that employ people who could be recruited to engage in prostitution, i.e. modeling agencies and escort agencies.

8.    Erotic clothing to include but not limited to lingerie, heels, provocatively revealing clothing, and any clothing or jewelry associated with modeling pictures or pictures advertising females recruited to work as prostitutes.

9.    Any records of travel for purposes of prostitution and any records that refer or relate in any way to the whereabouts of Xavier Lee and the identified females recruited to work as prostitutes for Lee.

10.   Any documents or records that relate to Facebook.com, wehavefuntimes.com, whftbazaar.com, or other websites which females could be recruited or advertised to work as prostitutes.

11.   Any records to show registration, management or administration of the websites www.wehavefuntimes.com, www.whftbazaar.com or other websites that could be used to recruit, solicit, exploit or advertise prostitutes, to include account information, passwords, billing records, account renewals and communications with the domain registrar or website hosting company.

12.     Sex toys and sex toy paraphernalia to include but not limited to lubrications, condoms, condom wrappers, vibrators, massagers, prosthetic penises, whip bondage material, and masturbation toys.

13.     Identification cards and other identification documents (such as driver's licenses) belonging to individuals not residing in that property.

14.     Records of hotel stays to include receipts, room keys, and evidence of communication with hotel staff.

15.     Cameras, cellular phones, video cameras, small cameras capable of being concealed (such as a "Go-Pro" camera) and other electronic devices used for taking photographs, exchanging messages, or that contain images, videos, addresses, telephone numbers, identity information or pictures of co-conspirators.

16.     Business records from any entity that might employ people who could be recruited to work as prostitutes, i.e. model agencies and escort agencies.

17.     Any and all web cameras, cameras, film, cell phones with cameras and/or internet capability, or other photographic equipment.

18.     Any and all visual depictions of females, to include depictions of females engaged in sexually explicit conduct, nude pictures, and modeling.

19.     Any and all documents, records, or correspondence pertaining to occupancy, ownership or other connection to 5 Hickory Ln, Elkton, MD 21921, a white 2008 Mitsubishi Lancer bearing Maryland license plate 3EDV57, or a white 2017 Jeep Grand Cherokee bearing Maryland license plate 8CP0647.

20.     Any and all diaries, notebooks, notes, address books, pictures, emails, chats, directions, maps, banking, travel, documents, and any other records reflecting personal contact and any other activities with females associated with prostitution or the attempted recruitment into prostitution.

21.     Any and all notes, documents, records, photos or correspondence that indicate a sexual interest in the recruitment of females to work as prostitutes, including, but not limited to:

        a.     Correspondence with females and attempts to recruit them;
        b.     Any and all visual depictions of females recruited to work as prostitutes;
        c.     Images and correspondence to promote or advertise prostitution;
        d.     Internet browsing history;
        e.     Books, logs, emails, chats, diaries and other documents.

As used above, the terms "records, documents, messages correspondence, data, and materials" includes records, documents, messages, correspondence, data, and materials, created

modified or stored in any form, including electronic or digital form, and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnet forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

22.     For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, "COMPUTER") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

     a.     Evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

     b.     Evidence of software that would allow other to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

     c.     Evidence of the lack of such malicious software;

     d.     Evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

     e.     Evidence of counter forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

     f.     Evidence of the times the COMPUTER was used;

     g.     Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER; documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

     h.     Contextual information necessary to understand the evidence described in this attachment; AND

     i.     Image and video files that depict females engaging in prostitution or sexual contact pursuant to Title 18, U.S.C. § 2242(a).

23.     With respect to the search of any of the items described in paragraphs 1 through 22 above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, to minimize the review of information not within the list of items to

be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

        a.    Surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

        b.    "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

        c.    "scanning" storage areas to discover and possible recover recently deleted files;

        d.    "scanning" storage areas for deliberately hidden files; or

        e.    Performing keyword searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

    24.    If after performing these procedures, the directories, files or storage areas do not reveal evidence of prostitution, advertising prostitution or recruitment into prostitution or other criminal activity, or evidence of who owns or uses the device, the further search of that particular directory, file or storage area, shall cease.

## ATTACHMENT A-3

### DESCRIPTION OF LOCATION TO BE SEARCHED

(Xavier Lee's Cell phone)

This warrant applies to information associated with the cell phone assigned telephone number:

443-466-6826

13

## ATTACHMENT B-3

## PARTICULAR THINGS TO BE SEIZED

(Xavier Lee's cell phone)

All information, including correspondence, records, documents, photographs, videos, electronic mail, chat logs, and electronic messages that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 1952(a)(3) (Use of Interstate Facilities to Promote Business Enterprise involving Prostitution Offenses; 2422(a) (Persuasion, Induction, Enticement, and Coercion to Travel in Interstate Commerce to Engage in Prostitution and Criminal Sexual Activity); 2251(a) (Production of Child Pornography); and 2252(A)(5)(B) (Possession of Child Pornography), including information pertaining to the following matters, including attempting and conspiring to engage in the following matters (the terms "records" and "information" include all of the below items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage and any photographic form):

1. Records relating to the purchase or placement of advertisements for commercial sex;

2. Records relating to the solicitation of customers for commercial sex;

3. Records relating to the scheduling of appointments for commercial sex;

4. Records relating to the travel or transportation of individuals to engage in commercial sex;

5. Records relating to sexually explicit or suggestive images of minors that may be used in furtherance of commercial sex trafficking;

6. Records relating to the recruitment, enticement, solicitation or coercion of individuals to engage in commercial sex;

7. Records relating to the fruits or instrumentalities of commercial sex trafficking, including currency and other financial instruments, jewelry, vehicles, controlled substances, and firearms.

8. Credit card and other financial information including but not limited to bills and payment records;

9. Evidence of who used, owned, or controlled the device listed on Attachment A-3;

10. Passwords and encryption keys, and other access information that may be necessary to access the device listed on Attachment A-3 and other associated accounts accessed using the device.

11. Any and all communications to include, but not limited to SMS messages, MMS messages, texting applications, notes and email communications with Lee and other known and unknown witnesses, victims or co-conspirators.

12. Subscriber Information, including the name and location, supplied by the user at the time of registration, the date the device was activated and all of the services of the device.

13. Records of user activity for each connection made to or from the Target device, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses, and any telephone, instrument or other unique identifiers;

14. All information about each communication sent or received by the device, including the date and time of the communication, the method of communication, and the source and destination of the communication (such as source and destination email addresses, IP addresses, telephone numbers and texting application numbers);

15. The contents of all e-mails stored in the account, including copies of e-mails sent to and from the device, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

16. The contents of all SMS and/or MMS text messages stored in the device, including copies of messages sent to and from the device, draft messages, the source and destination addresses associated with each message, the date and time at which each message was sent, and the size and length of each message;

17. Any deleted emails or messages, including any deleted information described in Paragraphs 15 and 16 above;

18. All Internet history and Internet search records, including the specific terms searched in association with the Target device, the dates, times and time zones of all searches, the IP addresses or telephone or instrument identifying numbers associated with those searches, and any data related to the results of the searches associated with the Target device and the Target device's use of any search results;

19. All records or other information regarding the identification of the device, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of services utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, and account status;

20. All records or other information stored by an individual using the device, including address books, contact and buddy lists, calendar data, pictures, videos and other data files;

21. All telephone or instrument numbers associated with the Target device (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"));

22. Pictures and videos depicting Lee and other known and unknown witnesses, victims or co-conspirators.

23. Any and all phone contacts, to include phone numbers, physical addresses and email accounts.

24. Saved location information where pictures, videos and locations searches were conducted.

25. If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.

## ATTACHMENT A-4

## DESCRIPTION OF LOCATION TO BE SEARCHED

(Xavier Lee's Mitsubishi Lancer)

This warrant applies to information associated with a white 2008 Mitsubishi Lancer sedan bearing Maryland license plate 3EDV57 and VIN# JA3AU26U98U039705, registered in the name of Debra Lynn Matthews.



**ATTACHMENT B-4**

**PARTICULAR THINGS TO BE SEIZED**

(Xavier Lee's Mitsubishi Lancer)

All items and information found in any of the subject locations described in Attachments A-4, that are evidence of a crime, contraband or fruits of a crime, or property designed, intended for use, or used in committing a crime, and specifically the crimes 18 U.S.C. §§ 1952(a)(3) (Use of Interstate Facilities to Promote Business Enterprise involving Prostitution Offenses; 2422(a) (Persuasion, Induction, Enticement, and Coercion to Travel in Interstate Commerce to Engage in Prostitution and Criminal Sexual Activity); 2251(a) (Production of Child Pornography); and 2252(A)(5)(B) (Possession of Child Pornography).

1.     Computer(s), computer hardware, software, related documentation, passwords, data security devices (as described below), videotapes, and/or video recording devices, and data that may constitute instrumentalities of, or contain evidence related to, this crime. The following definitions apply to the terms as set out in this affidavit and attachment:

     a.     Computer hardware: Computer hardware consists of all equipment, which can receive, capture, collect analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Hardware includes any data processing devices (including but not limited to cellular telephones, central processing units, laptops, tablets, eReaders, notes, iPads, and iPods; internal and peripheral storage devices such as external hard drives, thumb drives, SD cards, flash drives, USB storage devices, CDs and DVDs, and other memory storage devices); peripheral input/output devices (including but not limited to keyboards, printer, video display monitors, and related communication devices such as cables and connections), as well as any device mechanisms, or parts that can be used to restrict access to computer hardware (including but not limited to physical keys and locks).

     b.     Computer software is digital information, which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

     c.     Documentation: Computer related documentation consists of written, recorded printed, or electronically stored material, which explains, or illustrates how to configure or use computer hardware, software, or other related items.

     d.     Passwords and Data Security Devices: Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation or data. Data security devices may consist of hardware, software or other programming code.

18

2.      Any and all notes, documents, records, or correspondence pertaining to use of interstate facilities used to manage or operate a prostitution enterprise as defined under Title 18, U.S.C. § 2242(a).

3.      Any and all correspondence identifying persons transmitting, receiving or possessing, through interstate commerce including by U.S. Mails or by computer, any evidence of an enterprise involved in recruitment, advertising and engaging in a prostitution enterprise as defined under Title 18, U.S.C. § 2242(a).

4.      Any and all records, documents, invoices and materials that concern any accounts with Comcast, or any other Internet Service Provider, screen names, online accounts, or email accounts.

5.      Books, records, receipts, bank statements and records, money order and cashiers' checks, passbooks, bank check, safe deposit keys, pre-paid credit cards and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and or expenditure of money including but not limited to records regarding the use of prepaid bank cards or the transfer of money such as Western Union.

6.      Any and all United States Currency.

7.      Address and/or telephone books, rolodex indices, papers reflecting the identity, names, address and/or telephone numbers of possible co-conspirators, possible prostitution customers and of females involved in, or solicited to be involved in prostitution, and business information from entities that employ people who could be recruited to engage in prostitution, i.e. modeling agencies and escort agencies.

8.      Erotic clothing to include but not limited to lingerie, heels, provocatively revealing clothing, and any clothing or jewelry associated with modeling pictures or pictures advertising females recruited to work as prostitutes.

9.      Any records of travel for purposes of prostitution and any records that refer or relate in any way to the whereabouts of Xavier Lee and the identified females recruited to work as prostitutes for Lee.

10.     Any documents or records that relate to Facebook.com, wehavefuntimes.com, whftbazaar.com, or other websites which females could be recruited or advertised to work as prostitutes.

11.     Any records to show registration, management or administration of the websites www.wehavefuntimes.com, www.whftbazaar.com or other websites that could be used to recruit, solicit, exploit or advertise prostitutes, to include account information, passwords, billing records, account renewals and communications with the domain registrar or website hosting company.

12.     Sex toys and sex toy paraphernalia to include but not limited to lubrications, condoms, condom wrappers, vibrators, massagers, prosthetic penises, whip bondage material, and masturbation toys.

13.     Identification cards and other identification documents (such as driver's licenses) belonging to individuals not residing in that property.

14.     Records of hotel stays to include receipts, room keys, and evidence of communication with hotel staff.

15.     Cameras, cellular phones, video cameras, small cameras capable of being concealed (such as a "Go-Pro" camera) and other electronic devices used for taking photographs, exchanging messages, or that contain images, videos, addresses, telephone numbers, identity information or pictures of co-conspirators.

16.     Business records from any entity that might employ people who could be recruited to work as prostitutes, i.e. model agencies and escort agencies.

17.     Any and all web cameras, cameras, film, cell phones with cameras and/or internet capability, or other photographic equipment.

18.     Any and all visual depictions of females, to include depictions of females engaged in sexually explicit conduct, nude pictures, and modeling.

19.     Any and all documents, records, or correspondence pertaining to occupancy, ownership or other connection to 5 Hickory Ln, Elkton, MD 21921, a white 2008 Mitsubishi Lancer bearing Maryland license plate 3EDV57, or a white 2017 Jeep Grand Cherokee bearing Maryland license plate 8CP0647.

20.     Any and all diaries, notebooks, notes, address books, pictures, emails, chats, directions, maps, banking, travel, documents, and any other records reflecting personal contact and any other activities with females associated with prostitution or the attempted recruitment into prostitution.

21.     Any and all notes, documents, records, photos or correspondence that indicate a sexual interest in the recruitment of females to work as prostitutes, including, but not limited to:

a.     Correspondence with females and attempts to recruit them;
b.     Any and all visual depictions of females recruited to work as prostitutes;
c.     Images and correspondence to promote or advertise prostitution;
d.     Internet browsing history;
e.     Books, logs, emails, chats, diaries and other documents.

As used above, the terms "records, documents, messages correspondence, data, and materials" includes records, documents, messages, correspondence, data, and materials, created

20

modified or stored in any form, including electronic or digital form, and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnet forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

22. For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, "COMPUTER") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

a. Evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. Evidence of software that would allow other to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. Evidence of the lack of such malicious software;

d. Evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e. Evidence of counter forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f. Evidence of the times the COMPUTER was used;

g. Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER; documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

h. Contextual information necessary to understand the evidence described in this attachment; AND

i. Image and video files that depict females engaging in prostitution and sexual contact pursuant to Title 18, U.S.C. § 2242(a).

23. With respect to the search of any of the items described in paragraphs 1 through 22 above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, to minimize the review of information not within the list of items to

be seized as set forth herein, while permitting government examination of all the data necessary
to determine whether that data falls within the items to be seized):

        a.    Surveying various file "directories" and the individual files they contain
(analogous to looking at the outside of a file cabinet for markings it contains and opening a
drawer believed to contain pertinent files);

        b.    "opening" or cursorily reading the first few "pages" of such files in order
to determine their precise contents;

        c.    "scanning" storage areas to discover and possible recover recently deleted
files;

        d.    "scanning" storage areas for deliberately hidden files; or

        e.    Performing keyword searches or other search and retrieval searches
through all electronic storage areas to determine whether occurrences of language contained in
such storage areas exist that are intimately related to the subject matter of the investigation.

        24.    If after performing these procedures, the directories, files or storage areas do not
reveal evidence of prostitution, advertising prostitution or recruitment into prostitution or other
criminal activity, or evidence of who owns or uses the device, the further search of that particular
directory, file or storage area, shall cease.

## ATTACHMENT A-5

## DESCRIPTION OF LOCATION TO BE SEARCHED

(Xavier Lee's Jeep Grand Cherokee)

This warrant applies to the search of the white 2017 Jeep Grand Cherokee bearing Maryland license plate 8CP0647 and VIN# 1C4RJFJG3HC647103, registered in the name of Xavier Demarr Lee.



## **ATTACHMENT B-5**

## **PARTICULAR THINGS TO BE SEIZED**

(Xavier Lee's Jeep Grand Cherokee)

All items and information found in any of the subject locations described in Attachments A-5, that are evidence of a crime, contraband or fruits of a crime, or property designed, intended for use, or used in committing a crime, and specifically the crimes 18 U.S.C. §§ 1952(a)(3) (Use of Interstate Facilities to Promote Business Enterprise involving Prostitution Offenses; 2422(a) (Persuasion, Induction, Enticement, and Coercion to Travel in Interstate Commerce to Engage in Prostitution and Criminal Sexual Activity); 2251(a) (Production of Child Pornography); and 2252(A)(5)(B) (Possession of Child Pornography).

1.    Computer(s), computer hardware, software, related documentation, passwords, data security devices (as described below), videotapes, and/or video recording devices, and data that may constitute instrumentalities of, or contain evidence related to, this crime. The following definitions apply to the terms as set out in this affidavit and attachment:

a.    Computer hardware: Computer hardware consists of all equipment, which can receive, capture, collect analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Hardware includes any data processing devices (including but not limited to cellular telephones, central processing units, laptops, tablets, eReaders, notes, iPads, and iPods; internal and peripheral storage devices such as external hard drives, thumb drives, SD cards, flash drives, USB storage devices, CDs and DVDs, and other memory storage devices); peripheral input/output devices (including but not limited to keyboards, printer, video display monitors, and related communication devices such as cables and connections), as well as any device mechanisms, or parts that can be used to restrict access to computer hardware (including but not limited to physical keys and locks).

b.    Computer software is digital information, which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

c.    Documentation: Computer related documentation consists of written, recorded printed, or electronically stored material, which explains, or illustrates how to configure or use computer hardware, software, or other related items.

d.    Passwords and Data Security Devices: Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation or data. Data security devices may consist of hardware, software or other programming code.

2.     Any and all notes, documents, records, or correspondence pertaining to use of interstate facilities used to manage or operate a prostitution enterprise as defined under Title 18, U.S.C. § 2242(a).

3.     Any and all correspondence identifying persons transmitting, receiving or possessing, through interstate commerce including by U.S. Mails or by computer, any evidence of an enterprise involved in recruitment, advertising and engaging in a prostitution enterprise as defined under Title 18, U.S.C. § 2242(a).

4.     Any and all records, documents, invoices and materials that concern any accounts with Comcast, or any other Internet Service Provider, screen names, online accounts, or email accounts.

5.     Books, records, receipts, bank statements and records, money order and cashiers' checks, passbooks, bank check, safe deposit keys, pre-paid credit cards and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and or expenditure of money including but not limited to records regarding the use of prepaid bank cards or the transfer of money such as Western Union.

6.     Any and all United States Currency.

7.     Address and/or telephone books, rolodex indices, papers reflecting the identity, names, address and/or telephone numbers of possible co-conspirators, possible prostitution customers and of females involved in, or solicited to be involved in prostitution, and business information from entities that employ people who could be recruited to engage in prostitution, i.e. modeling agencies and escort agencies.

8.     Erotic clothing to include but not limited to lingerie, heels, provocatively revealing clothing, and any clothing or jewelry associated with modeling pictures or pictures advertising females recruited to work as prostitutes.

9.     Any records of travel for purposes of prostitution and any records that refer or relate in any way to the whereabouts of Xavier Lee and the identified females recruited to work as prostitutes for Lee.

10.    Any documents or records that relate to Facebook.com, wehavefuntimes.com, whftbazaar.com, or other websites which females could be recruited or advertised to work as prostitutes.

11.    Any records to show registration, management or administration of the websites www.wehavefuntimes.com, www.whftbazaar.com or other websites that could be used to recruit, solicit, exploit or advertise prostitutes, to include account information, passwords, billing records, account renewals and communications with the domain registrar or website hosting company.

12.     Sex toys and sex toy paraphernalia to include but not limited to lubrications, condoms, condom wrappers, vibrators, massagers, prosthetic penises, whip bondage material, and masturbation toys.

13.     Identification cards and other identification documents (such as driver's licenses) belonging to individuals not residing in that property.

14.     Records of hotel stays to include receipts, room keys, and evidence of communication with hotel staff.

15.     Cameras, cellular phones, video cameras, small cameras capable of being concealed (such as a "Go-Pro" camera) and other electronic devices used for taking photographs, exchanging messages, or that contain images, videos, addresses, telephone numbers, identity information or pictures of co-conspirators.

16.     Business records from any entity that might employ people who could be recruited to work as prostitutes, i.e. model agencies and escort agencies.

17.     Any and all web cameras, cameras, film, cell phones with cameras and/or internet capability, or other photographic equipment.

18.     Any and all visual depictions of females, to include depictions of females engaged in sexually explicit conduct, nude pictures, and modeling.

19.     Any and all documents, records, or correspondence pertaining to occupancy, ownership or other connection to 5 Hickory Ln, Elkton, MD 21921, a white 2008 Mitsubishi Lancer bearing Maryland license plate 3EDV57, or a white 2017 Jeep Grand Cherokee bearing Maryland license plate 8CP0647.

20.     Any and all diaries, notebooks, notes, address books, pictures, emails, chats, directions, maps, banking, travel, documents, and any other records reflecting personal contact and any other activities with females associated with prostitution or the attempted recruitment into prostitution.

21.     Any and all notes, documents, records, photos or correspondence that indicate a sexual interest in the recruitment of females to work as prostitutes, including, but not limited to:

        a.     Correspondence with females and attempts to recruit them;
        b.     Any and all visual depictions of females recruited to work as prostitutes;
        c.     Images and correspondence to promote or advertise prostitution;
        d.     Internet browsing history;
        e.     Books, logs, emails, chats, diaries and other documents.

As used above, the terms "records, documents, messages correspondence, data, and materials" includes records, documents, messages, correspondence, data, and materials, created

modified or stored in any form, including electronic or digital form, and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnet forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

22.     For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, "COMPUTER") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

      a.     Evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

      b.     Evidence of software that would allow other to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      c.     Evidence of the lack of such malicious software;

      d.     Evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

      e.     Evidence of counter forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

      f.     Evidence of the times the COMPUTER was used;

      g.     Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER; documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

      h.     Contextual information necessary to understand the evidence described in this attachment; AND

      i.     Image and video files that depict females engaging in prostitution and sexual activity pursuant to Title 18, U.S.C. § 2242(a).

23.     With respect to the search of any of the items described in paragraphs 1 through 22 above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, to minimize the review of information not within the list of items to

be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

         a.     Surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

         b.     "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

         c.     "scanning" storage areas to discover and possible recover recently deleted files;

         d.     "scanning" storage areas for deliberately hidden files; or

         e.     Performing keyword searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

     24.     If after performing these procedures, the directories, files or storage areas do not reveal evidence of prostitution, advertising prostitution or recruitment into prostitution or other criminal activity, or evidence of who owns or uses the device, the further search of that particular directory, file or storage area, shall cease.

## ATTACHENT A-6

## DESCRIPTION OF LOCATION TO BE SEARCHED

(Xavier Lee's Person)

This warrant applies to the search of the person of Xavier Lee who is further described as follows:

Name: Xavier Demarr Lee
DOB:  January 12, 1979
Race:  African American
Height:  5'8"
Weight:  250 pounds



**ATTACHMENT B-6**

**PARTICULAR THINGS TO BE SEIZED**

(Xavier Lee's Person)

All items and information found in any of the subject locations described in Attachments A-6, that are evidence of a crime, contraband or fruits of a crime, or property designed, intended for use, or used in committing a crime, and specifically the crimes 18 U.S.C. §§ 1952(a)(3) (Use of Interstate Facilities to Promote Business Enterprise involving Prostitution Offenses; 2422(a) (Persuasion, Induction, Enticement, and Coercion to Travel in Interstate Commerce to Engage in Prostitution and Criminal Sexual Activity); 2251(a) (Production of Child Pornography); and 2252(A)(5)(B) (Possession of Child Pornography), including the following:

1.      Computer(s), computer hardware, software, related documentation, passwords, data security devices (as described below), videotapes, and/or video recording devices, and data that may constitute instrumentalities of, or contain evidence related to, this crime. The following definitions apply to the terms as set out in this affidavit and attachment:

a.      Computer hardware: Computer hardware consists of all equipment, which can receive, capture, collect analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Hardware includes any data processing devices (including but not limited to cellular telephones, central processing units, laptops, tablets, eReaders, notes, iPads, and iPods; internal and peripheral storage devices such as external hard drives, thumb drives, SD cards, flash drives, USB storage devices, CDs and DVDs, and other memory storage devices); peripheral input/output devices (including but not limited to keyboards, printer, video display monitors, and related communication devices such as cables and connections), as well as any device mechanisms, or parts that can be used to restrict access to computer hardware (including but not limited to physical keys and locks).

b.      Computer software is digital information, which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

c.      Documentation: Computer related documentation consists of written, recorded printed, or electronically stored material, which explains, or illustrates how to configure or use computer hardware, software, or other related items.

d.      Passwords and Data Security Devices: Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation or data. Data security devices may consist of hardware, software or other programming code.

30

2.      Any and all notes, documents, records, or correspondence pertaining to use of interstate facilities used to manage or operate a prostitution enterprise as defined under Title 18, U.S.C. § 2242(a).

3.      Any and all correspondence identifying persons transmitting, receiving or possessing, through interstate commerce including by U.S. Mails or by computer, any evidence of an enterprise involved in recruitment, advertising and engaging in a prostitution enterprise as defined under Title 18, U.S.C. § 2242(a).

4.      Any and all records, documents, invoices and materials that concern any accounts with Comcast, or any other Internet Service Provider, screen names, online accounts, or email accounts.

5.      Books, records, receipts, bank statements and records, money order and cashiers' checks, passbooks, bank check, safe deposit keys, pre-paid credit cards and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and or expenditure of money including but not limited to records regarding the use of prepaid bank cards or the transfer of money such as Western Union.

6.      Any and all United States Currency.

7.      Address and/or telephone books, rolodex indices, papers reflecting the identity, names, address and/or telephone numbers of possible co-conspirators, possible prostitution customers and of females involved in, or solicited to be involved in prostitution, and business information from entities that employ people who could be recruited to engage in prostitution, i.e. modeling agencies and escort agencies.

8.      Erotic clothing to include but not limited to lingerie, heels, provocatively revealing clothing, and any clothing or jewelry associated with modeling pictures or pictures advertising females recruited to work as prostitutes.

9.      Any records of travel for purposes of prostitution and any records that refer or relate in any way to the whereabouts of Xavier Lee and the identified females recruited to work as prostitutes for Lee.

10.     Any documents or records that relate to Facebook.com, wehavefuntimes.com, whftbazaar.com, or other websites which females could be recruited or advertised to work as prostitutes.

11.     Any records to show registration, management or administration of the websites www.wehavefuntimes.com, www.whftbazaar.com or other websites that could be used to recruit, solicit, exploit or advertise prostitutes, to include account information, passwords, billing records, account renewals and communications with the domain registrar or website hosting company.

31

12.     Sex toys and sex toy paraphernalia to include but not limited to lubrications, condoms, condom wrappers, vibrators, massagers, prosthetic penises, whip bondage material, and masturbation toys.

13.     Identification cards and other identification documents (such as driver's licenses) belonging to individuals not residing in that property.

14.     Records of hotel stays to include receipts, room keys, and evidence of communication with hotel staff.

15.     Cameras, cellular phones, video cameras, small cameras capable of being concealed (such as a "Go-Pro" camera) and other electronic devices used for taking photographs, exchanging messages, or that contain images, videos, addresses, telephone numbers, identity information or pictures of co-conspirators.

16.     Business records from any entity that might employ people who could be recruited to work as prostitutes, i.e. model agencies and escort agencies.

17.     Any and all web cameras, cameras, film, cell phones with cameras and/or internet capability, or other photographic equipment.

18.     Any and all visual depictions of females, to include depictions of females engaged in sexually explicit conduct, nude pictures, and modeling.

19.     Any and all documents, records, or correspondence pertaining to occupancy, ownership or other connection to 5 Hickory Ln, Elkton, MD 21921, a white 2008 Mitsubishi Lancer bearing Maryland license plate 3EDV57, or a white 2017 Jeep Grand Cherokee bearing Maryland license plate 8CP0647.

20.     Any and all diaries, notebooks, notes, address books, pictures, emails, chats, directions, maps, banking, travel, documents, and any other records reflecting personal contact and any other activities with females associated with prostitution or the attempted recruitment into prostitution.

21.     Any and all notes, documents, records, photos or correspondence that indicate a sexual interest in the recruitment of females to work as prostitutes, including, but not limited to:

        a.     Correspondence with females and attempts to recruit them;
        b.     Any and all visual depictions of females recruited to work as prostitutes;
        c.     Images and correspondence to promote or advertise prostitution;
        d.     Internet browsing history;
        e.     Books, logs, emails, chats, diaries and other documents.

As used above, the terms "records, documents, messages correspondence, data, and materials" includes records, documents, messages, correspondence, data, and materials, created

modified or stored in any form, including electronic or digital form, and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnet forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

22. For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, "COMPUTER") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

a. Evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. Evidence of software that would allow other to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. Evidence of the lack of such malicious software;

d. Evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e. Evidence of counter forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f. Evidence of the times the COMPUTER was used;

g. Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER; documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

h. Contextual information necessary to understand the evidence described in this attachment; AND

i. Image and video files that depict females engaging in prostitution and sexual activity pursuant to Title 18, U.S.C. § 2242(a).

23. With respect to the search of any of the items described in paragraphs 1 through 22 above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, to minimize the review of information not within the list of items to

33

be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

        j.     Surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

        k.     "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

        l.     "scanning" storage areas to discover and possible recover recently deleted files;

        m.     "scanning" storage areas for deliberately hidden files; or

        n.     Performing keyword searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

      24.     If after performing these procedures, the directories, files or storage areas do not reveal evidence of prostitution, advertising prostitution or recruitment into prostitution or other criminal activity, or evidence of who owns or uses the device, the further search of that particular directory, file or storage area, shall cease.

## ATTACHMENT A-7

## DESCRIPTION OF LOCATION TO BE SEARCHED

(Days Inn Room Premises)

This warrant applies to information associated with the hotel room # 209 and the external areas surrounding that hotel room, including walkways, external windows, ledges, railings, etc., for The Days Inn is located at:

**311 Belle Hill Rd., Elkton, MD 21921**

The Days Inn motel is further described as a two-story hotel with rooms accessible from the exterior of the hotel. Room #209 is on the second floor on the inside corner where the South facing and West facing wings of the building connect. Room #209 has a blue door with a silver handle on the right side. The numbers "209" are written in white and are approximately two inches tall. They are affixed to the wall to the right of the door on a maroon colored placard.



**ATTACHMENT B-7**

**PARTICULAR THINGS TO BE SEIZED**

(Days Inn Room Premises)

All items and information found in the subject location described in Attachment A-7, that are evidence of a crime, contraband or fruits of a crime, or property designed, intended for use, or used in committing a crime, and specifically the crimes 18 U.S.C. §§ 1952(a)(3) (Use of Interstate Facilities to Promote Business Enterprise involving Prostitution Offenses; 2422(a) (Persuasion, Induction, Enticement, and Coercion to Travel in Interstate Commerce to Engage in Prostitution and Criminal Sexual Activity); 2251(a) (Production of Child Pornography); and 2252(A)(5)(B) (Possession of Child Pornography), including the following:

1.     Computer(s), computer hardware, software, related documentation, passwords, data security devices (as described below), videotapes, and/or video recording devices, and data that may constitute instrumentalities of, or contain evidence related to, this crime. The following definitions apply to the terms as set out in this affidavit and attachment:

a.     Computer hardware: Computer hardware consists of all equipment, which can receive, capture, collect analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Hardware includes any data processing devices (including but not limited to cellular telephones, central processing units, laptops, tablets, eReaders, notes, iPads, and iPods; internal and peripheral storage devices such as external hard drives, thumb drives, SD cards, flash drives, USB storage devices, CDs and DVDs, and other memory storage devices); peripheral input/output devices (including but not limited to keyboards, printer, video display monitors, and related communication devices such as cables and connections), as well as any device mechanisms, or parts that can be used to restrict access to computer hardware (including but not limited to physical keys and locks).

b.     Computer software is digital information, which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

c.     Documentation: Computer related documentation consists of written, recorded printed, or electronically stored material, which explains, or illustrates how to configure or use computer hardware, software, or other related items.

d.     Passwords and Data Security Devices: Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation or data. Data security devices may consist of hardware, software or other programming code.

2.      Any and all notes, documents, records, or correspondence pertaining to use of interstate facilities used to manage or operate a prostitution enterprise as defined under Title 18, U.S.C. § 2242(a).

3.      Any and all correspondence identifying persons transmitting, receiving or possessing, through interstate commerce including by U.S. Mails or by computer, any evidence of an enterprise involved in recruitment, advertising and engaging in a prostitution enterprise as defined under Title 18, U.S.C. § 2242(a).

4.      Any and all records, documents, invoices and materials that concern any accounts with Comcast, or any other Internet Service Provider, screen names, online accounts, or email accounts.

5.      Books, records, receipts, bank statements and records, money order and cashiers' checks, passbooks, bank check, safe deposit keys, pre-paid credit cards and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and or expenditure of money including but not limited to records regarding the use of prepaid bank cards or the transfer of money such as Western Union.

6.      Any and all United States Currency.

7.      Address and/or telephone books, rolodex indices, papers reflecting the identity, names, address and/or telephone numbers of possible co-conspirators, possible prostitution customers and of females involved in, or solicited to be involved in prostitution, and business information from entities that employ people who could be recruited to engage in prostitution, i.e. modeling agencies and escort agencies.

8.      Erotic clothing to include but not limited to lingerie, heels, provocatively revealing clothing, and any clothing or jewelry associated with modeling pictures or pictures advertising females recruited to work as prostitutes.

9.      Any records of travel for purposes of prostitution and any records that refer or relate in any way to the whereabouts of Xavier Lee and the identified females recruited to work as prostitutes for Lee.

10.     Any documents or records that relate to Facebook.com, wehavefuntimes.com, whftbazaar.com, or other websites which females could be recruited or advertised to work as prostitutes.

11.     Any records to show registration, management or administration of the websites www.wehavefuntimes.com, www.whftbazaar.com or other websites that could be used to recruit, solicit, exploit or advertise prostitutes, to include account information, passwords, billing records, account renewals and communications with the domain registrar or website hosting company.

37

12.     Sex toys and sex toy paraphernalia to include but not limited to lubrications, condoms, condom wrappers, vibrators, massagers, prosthetic penises, whip bondage material, and masturbation toys.

13.     Identification cards and other identification documents (such as driver's licenses) belonging to individuals not residing in that property.

14.     Records of hotel stays to include receipts, room keys, and evidence of communication with hotel staff.

15.     Cameras, cellular phones, video cameras, small cameras capable of being concealed (such as a "Go-Pro" camera) and other electronic devices used for taking photographs, exchanging messages, or that contain images, videos, addresses, telephone numbers, identity information or pictures of co-conspirators.

16.     Business records from any entity that might employ people who could be recruited to work as prostitutes, i.e. model agencies and escort agencies.

17.     Any and all web cameras, cameras, film, cell phones with cameras and/or internet capability, or other photographic equipment.

18.     Any and all visual depictions of females, to include depictions of females engaged in sexually explicit conduct, nude pictures, and modeling.

19.     Any and all documents, records, or correspondence pertaining to occupancy, ownership or other connection to 5 Hickory Ln, Elkton, MD 21921, a white 2008 Mitsubishi Lancer bearing Maryland license plate 3EDV57, or a white 2017 Jeep Grand Cherokee bearing Maryland license plate 8CP0647.

20.     Any and all diaries, notebooks, notes, address books, pictures, emails, chats, directions, maps, banking, travel, documents, and any other records reflecting personal contact and any other activities with females associated with prostitution or the attempted recruitment into prostitution.

21.     Any and all notes, documents, records, photos or correspondence that indicate a sexual interest in the recruitment of females to work as prostitutes, including, but not limited to:

      a.     Correspondence with females and attempts to recruit them;
      b.     Any and all visual depictions of females recruited to work as prostitutes;
      c.     Images and correspondence to promote or advertise prostitution;
      d.     Internet browsing history;
      e.     Books, logs, emails, chats, diaries and other documents.

As used above, the terms "records, documents, messages correspondence, data, and materials" includes records, documents, messages, correspondence, data, and materials, created

modified or stored in any form, including electronic or digital form, and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnet forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

22.    For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, "COMPUTER") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

a.    Evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.    Evidence of software that would allow other to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    Evidence of the lack of such malicious software;

d.    Evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e.    Evidence of counter forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f.    Evidence of the times the COMPUTER was used;

g.    Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER; documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

h.    Contextual information necessary to understand the evidence described in this attachment; AND

i.    Image and video files that depict females engaging in prostitution and sexual activity pursuant to Title 18, U.S.C. § 2242(a).

23.    With respect to the search of any of the items described in paragraphs 1 through 22 above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, to minimize the review of information not within the list of items to

be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

        j.      Surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

        k.     "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

        l.     "scanning" storage areas to discover and possible recover recently deleted files;

        m.    "scanning" storage areas for deliberately hidden files; or

        n.     Performing keyword searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

     24.     If after performing these procedures, the directories, files or storage areas do not reveal evidence of prostitution, advertising prostitution or recruitment into prostitution or other criminal activity, or evidence of who owns or uses the device, the further search of that particular directory, file or storage area, shall cease.

## ATTACHMENT A-8

## DESCRIPTION OF LOCATION TO BE SEARCHED

(Days Inn Office)

This warrant applies to information associated with the Days Inn Office located at:

**311 Belle Hill Rd, Elkton, MD 21921**

The Days Inn motel is further described as a two-story hotel with room accessible from the exterior of the hotel. The Office is on the first floor facing Belle Hill Road. The exterior of the Office is painted yellow with brown trim. There is a white picket fence at the front of the entrance. The number "311" are affixed to a column in front of the glass entrance door and are approximately four inches tall.



41

## ATTACHMENT B-8
## PARTICULAR THINGS TO BE SEIZED
(Days Inn Office)

All items and information found in the subject location described in Attachment A-8, that are evidence of a crime, contraband or fruits of a crime, or property designed, intended for use, or used in committing a crime, and specifically the crimes 18 U.S.C. §§ 1952(a)(3) (Use of Interstate Facilities to Promote Business Enterprise involving Prostitution Offenses; 2422(a) (Persuasion, Induction, Enticement, and Coercion to Travel in Interstate Commerce to Engage in Prostitution and Criminal Sexual Activity); 2251(a) (Production of Child Pornography); and 2252(A)(5)(B) (Possession of Child Pornography), for the period of August 2015 to present, including the following:

1.      Computer(s), computer hardware, software, related documentation, passwords, data security devices (as described below), videotapes, and/or video recording devices, and data that may constitute instrumentalities of, or contain evidence related to, this crime that are owned or operated by the Days Inn business enterprise and are not the personal property of employees at the Days Inn. The following definitions apply to the terms as set out in this affidavit and attachment:

        a.      Computer hardware: Computer hardware consists of all equipment, which can receive, capture, collect analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Hardware includes any data processing devices (including but not limited to cellular telephones, central processing units, laptops, tablets, eReaders, notes, iPads, and iPods; internal and peripheral storage devices such as external hard drives, thumb drives, SD cards, flash drives, USB storage devices, CDs and DVDs, and other memory storage devices); peripheral input/output devices (including but not limited to keyboards, printer, video display monitors, and related communication devices such as cables and connections), as well as any device mechanisms, or parts that can be used to restrict access to computer hardware (including but not limited to physical keys and locks).

        b.      Computer software is digital information, which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

        c.      Documentation: Computer related documentation consists of written, recorded printed, or electronically stored material, which explains, or illustrates how to configure or use computer hardware, software, or other related items.

42

d.     Passwords and Data Security Devices: Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation or data. Data security devices may consist of hardware, software or other programming code.

2.     Any and all notes, documents, records, or correspondence pertaining to use of interstate facilities used to manage or operate a prostitution enterprise as defined under Title 18, U.S.C. § 2242(a).

3.     Any and all correspondence identifying persons transmitting, receiving or possessing, through interstate commerce including by U.S. Mails or by computer, any evidence of an enterprise involved in recruitment, advertising and engaging in a prostitution enterprise as defined under Title 18, U.S.C. § 2242(a).

4.     Books, records, receipts, bank statements and records, money order and cashiers' checks, passbooks, bank check, safe deposit keys, pre-paid credit cards and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and or expenditure of money including but not limited to records regarding the use of prepaid bank cards or the transfer of money such as Western Union.

5.     Any and all United States Currency related to business proceeds from the operation, illicit or licit, of the Days Inn but not to include personal currency found on the persons or in the possession of any Days Inn employees.

6.     Address and/or telephone books, rolodex indices, papers reflecting the identity, names, address and/or telephone numbers of possible co-conspirators, possible prostitution customers and of females involved in, or solicited to be involved in prostitution, and business information from entities that employ people who could be recruited to engage in prostitution, i.e. modeling agencies and escort agencies.

7.     Any records of Lee and his rental of rooms for the purposes of prostitution and any records that refer or relate in any way to Xavier Lee and the identified females recruited to work as prostitutes for Lee.

8.     Any records to show knowledge or use of the websites www.wehavefuntimes.com, www.whftbazaar.com or other websites that could be used to recruit, solicit, exploit or advertise prostitutes, to include account information, passwords or computer links.

9.     Identification cards, copies of identifications and other identification documents (such as driver's licenses) belonging to individuals possibly associated with Xavier Lee.

10.    Records of hotel stays of Xavier Lee and others associated with Xavier Lee to include receipts, electronic folio records, room keys, and evidence of communication with hotel

43

staff or notes to hotel staff regarding any arrangements or agreements for room rentals to Xavier Lee or his associates.

11.     Devices owned or operated by the Days Inn business that are capable of recording the interactions of Xavier Lee and others associated with Xavier Lee, including cameras, video cameras, small cameras, and other electronic devices used for taking photographs, exchanging messages, or that contain images, videos, addresses, telephone numbers, identity information or pictures of co-conspirators. Such devices will not include the personal property of employees of the Days Inn.

12.     Business records from any entity that might identify people who could be recruited to work as prostitutes, i.e. model agencies and escort agencies.

13.     Any and all visual depictions of females, to include depictions of females engaged in sexually explicit conduct, nude pictures, and modeling.

14.     Any and all diaries, notebooks, notes, address books, pictures, emails, chats, directions, maps, banking, travel, documents, and any other records reflecting personal contact and any other activities with Xavier Lee or females associated with prostitution or the attempted recruitment into prostitution.

As used above, the terms "records, documents, messages correspondence, data, and materials" includes records, documents, messages, correspondence, data, and materials, created modified or stored in any form, including electronic or digital form, and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnet forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

15.     For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, "COMPUTER") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

a.     Evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.     Evidence of software that would allow other to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.     Evidence of the lack of such malicious software;

d.     Evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

44

e.      Evidence of counter forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f.      Evidence of the times the COMPUTER was used;

g.      Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER; documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

h.      Contextual information necessary to understand the evidence described in this attachment; AND

i.      Image and video files that depict females engaging in prostitution and sexual activity pursuant to Title 18, U.S.C. § 2242(a).

16.      With respect to the search of any of the items described in paragraphs 1 through 15 above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, to minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):